## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| AARON GOINS *et al.*, | ) | |
| | ) | |
| *Plaintiffs/Counter-Defendants,* | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-00489-LCB-JLW |
| | ) | |
| TITLEMAX OF VIRGINIA, INC. *et al.*, | ) | |
| | ) | |
| *Defendants/Counter-Claimants.* | ) | |
| | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL ARBITRATIONS AND STAY PROCEEDINGS

Defendants/Counter-Claimants TitleMax of Virginia, Inc., TitleMax of South Carolina, Inc., and TMX Finance of Virginia, Inc. (collectively, "TitleMax") submit this response in opposition to the Motion to Compel Arbitrations and Stay Proceedings (ECF No. 30) filed by 242 of the 264 Plaintiffs/Counter-Defendants ("Plaintiffs").

## INTRODUCTION

Plaintiffs move for an order compelling their *own lawsuit* to arbitration. They chose to file their claims in court because Plaintiffs believed they could obtain strategic advantages by filing a public mass action. Plaintiffs allege in their complaint that their claims are all covered by contracts requiring individual arbitration, but they chose to file a mass court action because it was easier for them to file that action than to initiate hundreds of individual

arbitration proceedings. Now that they have publicly accused TitleMax of violating North Carolina law, Plaintiffs ask this Court *not* to reach the merits of their *own* claims. The Court should deny that request for two main reasons.

First, as a threshold matter, Plaintiffs offer *no evidence* supporting their allegations that all 242 moving Plaintiffs agreed to arbitrate their claims with TitleMax. They offer only unauthenticated, self-contradictory, and vague exhibits in support of their motion. Those exhibits cannot carry Plaintiffs' burden of presenting credible, admissible evidence showing the specific terms of an agreement to arbitrate. That failure is fatal to Plaintiffs' motion to compel arbitration.

Second, Plaintiffs lost any right to arbitration they may have had when they filed this mass action. As Plaintiffs themselves recognize, parties to an arbitration agreement cannot "ignor[e] their contractual commitments and run[] to court whenever the prospect of arbitration appears uninviting." Pls.' Br. Supp. Mot. Compel at 6, ECF No. 31. That is what Plaintiffs did here: they filed a lawsuit because they found it more convenient than initiating hundreds of individual arbitrations. Their decision to file that lawsuit imposed real financial, reputational, and other costs on TitleMax. One website even published an article about this "group of North Carolina residents" filing "a suit against [TitleMax] over allegations that liens were

2

illegally placed on their vehicles." Carrie Bradon, *North Carolina Residents Allege TitleMax of South Carolina Charged Excessive Interest Rate*, Legal Newsline (May 29, 2019), https://perma.cc/WJ3T-AEAY. Plaintiffs cannot impose these costs on TitleMax and then turn their back on the lawsuit they filed as soon as it comes time for the Court to hear their claims on the merits.

This is a baseless lawsuit. Plaintiffs filed it in the hope that TitleMax would make hundreds of unjustified settlement offers to avoid the expense and burden of defending its lawful Virginia and South Carolina business practices in this North Carolina forum. TitleMax chooses instead to defend its practices on the merits.

## BACKGROUND

### A. Plaintiffs Sue TitleMax in Court

Plaintiffs are 264 individuals who filed this mass action in the Guilford County General Court of Justice on April 4, 2019. *See* Compl., ECF No. 1-1. Plaintiffs allege that they are "North Carolina residents who entered into one or more title loan transaction(s) with one or more of the Defendants." *Id.* ¶ 1. They purport to bring various claims under North Carolina law against TitleMax arising from those loans. *See id.* ¶¶ 25–43.

Plaintiffs filed this mass action in court even though they allege that the "loan agreements contain at issue [sic] an arbitration provision which cover [sic] all of the claims asserted herein." *Id.* ¶ 48. Plaintiffs do not

3

allege—and they could not have alleged—that TitleMax refused to arbitrate any of those claims before Plaintiffs filed their lawsuit. Instead, Plaintiffs allege that their counsel had "to take court time and resources by filing this mass action to seek to have the matters ordered to arbitration and to protect his clients' claims" against the running of any applicable limitations periods. *Id*. ¶ 9. Plaintiffs fail to acknowledge here that TitleMax *did* offer to enter tolling agreements with all Plaintiffs in this lawsuit if those Plaintiffs would honor all agreements to resolve claims in arbitration rather than file lawsuits. Plaintiffs rejected this offer and now allege that "TitleMax refuses to *unconditionally* enter into a tolling agreement." *Id*. (emphasis added). The "condition" Plaintiffs refer to here is TitleMax's insistence that all Plaintiffs who agreed to arbitrate their claims comply with that agreement by filing those claims in arbitration, not in court.

Plaintiffs do not explain why they refused to initiate arbitration. At most, Plaintiffs state that "[m]any" of them "do not have their contract documents" and thereby imply that they were unable to begin arbitration. *Id*. ¶ 8. As an initial matter, that explanation does not apply to the many Plaintiffs who must still have their contracts.

For those unidentified Plaintiffs who allegedly lost their contracts, there is no allegation that the Plaintiff was unable to obtain a replacement copy or unable to begin arbitration without that replacement copy. To the

4

contrary, any Plaintiffs who lost their contract documents chose not to return to the TitleMax location in Virginia or South Carolina where they executed the agreement, chose not to call TitleMax customer service, and chose not to visit TitleMax's online document portal to obtain another copy of their documents. They decided instead to utilize litigation tools at material cost to TitleMax by filing a mass action against TitleMax before even trying to initiate arbitration.

In May 2019, TitleMax removed Plaintiffs' mass action to this Court and filed counterclaims. *See* ECF Nos. 1, 2. That same month, eight Plaintiffs—Andrea Sells, Candice Perkins, Cassandra Brooks, Daveda Hines, Davie Dawkins, Dominick Hinson, Reginald Brown, and Stanley Ewings— initiated arbitration against TitleMax for the first time by filing demands for arbitration with the American Arbitration Association ("AAA"). *See* Letter from Christopher W. Jones to Meghan Richardson (Aug. 23, 2019) ("Claimants filed the *Goins* complaint on April 4, 2019; the first of the demands for arbitration was submitted to AAA on or about May 2, 2019."), ECF No. 31-5, at 2. These eight Plaintiffs attached copies of contracts containing AAA arbitration provisions and asked AAA to resolve the same claims that they bring against TitleMax here. None of these eight Plaintiffs dismissed their claims here before (or since) initiating those second-filed arbitrations.

5

In June 2019, the parties held a Rule 26(f) conference to discuss scheduling and discovery in this case. *See* ECF Nos. 12–13. The parties then filed individual Rule 26(f) reports and appeared before the Court for an initial pretrial conference. *See* July 24, 2019, Minute Entry. The parties discussed during the conference various issues related to the identification and production of contracts between Plaintiffs and TitleMax. Counsel for TitleMax "argue[d] that discovery should commence immediately, and evidence surrounding arbitration will be revealed in discovery," and explained that TitleMax had "concerns regarding [Plaintiffs'] counsel[']s representation of certain Plaintiffs, and the correct identi[t]y of certain Plaintiffs related to specific contracts." *Id*. Following the hearing, the Court ordered Plaintiffs' counsel to provide, "for in-camera inspection, the client/attorney representation agreements of all clients/Plaintiffs in this matter." July 24, 2019, Text Order.

On August 13, 2019, and following the Court's review of those representation agreements, the Court ordered TitleMax to produce copies of agreements with some (but not all) Plaintiffs. *See* Order Summary In-Camera Documents, ECF No. 14. TitleMax complied with that order by serving 1,780 pages of responsive contracts on Plaintiffs' counsel. *See* Defs.' Notice of Compliance, ECF No. 16. The Court also "ordered Plaintiffs'

counsel to correct/revise client agreements subject to the discrepancies noted in the order." Sept. 19, 2019, Order at 1, ECF No. 19.

The parties returned for a second initial pretrial conference before the Court on September 18, 2019. Plaintiffs stated that they would be "filing a motion to compel arbitration on behalf of most Plaintiffs no later than September 30, 2019" and argued that "no discovery should commence at this time." *Id.* at 2. TitleMax responded that "discovery should commence immediately, and any further inquiry regarding the Title[M]ax contracts should be addressed through discovery methods." *Id.*

On September 19, 2019, the Court ordered counsel for Plaintiffs to inform TitleMax of the Plaintiffs who now have valid engagement letters and ordered TitleMax to produce copies of agreements with those Plaintiffs. *See id.* TitleMax made that production on September 26, 2019. *See* Defs.' Notice of Compliance, ECF No. 23.

The Court also ordered on September 19 that (1) "Plaintiffs' counsel shall have up to and including **September 30, 2019** to file a motion to compel arbitration"; and (2) discovery would begin for "all Plaintiffs not subject to the motion to compel arbitration" on October 1, 2019. Sept. 19, 2019, Order at 2 ¶¶ 1, 3. TitleMax has had no opportunity to serve discovery asking the Plaintiffs now moving to compel arbitration to provide basic identifying information.

On September 25 and 30, Plaintiffs filed two motions for leave to correct the spellings of their own names. *See* ECF Nos. 21, 26. Two Plaintiffs—Loraine White and Ricky Adams—sought leave to correct twice: once to correct their names and then once more to fix those corrections. *See* ECF Nos. 21, 26. Even after filing these two motions to correct, Plaintiffs have not requested leave to fix the spellings of seven names that this Court already identified as being incorrect or misspelled in the Complaint. *See* Order Summary In-Camera Documents at 2–3, ECF No. 14. These seven Plaintiffs include "Jfffrey Hankins." Compl. Caption, ECF No. 1-1, at 3.

### B. Plaintiffs Move to Compel Arbitration of Their Own Lawsuit

On September 30, 2019, Plaintiffs filed their Motion to Compel Arbitration and Stay Proceedings. ECF No. 30. The moving Plaintiffs are defined as the Plaintiffs "identified in Exhibits 1 and 6" to Plaintiffs' supporting brief. *See* Pls.' Br. Supp. Mot. Compel at 1. Together, Exhibits 1 and 6 list 242 of the 264 Plaintiffs; 22 Plaintiffs have not moved to compel arbitration or to stay these proceedings.[1]

---

[1] The non-moving Plaintiffs are Anthony Rosado, Brittany Callahan, Cedric Moses, Crystal Owens, Davie Richardson, Dwayne Cockerham, Edna Taylor, Ella Manns, James Wilson Jr., Johnny Hardison, Kajuane Rorie, Kevin Lemar Smith, Lekitta Robinson, Linda Bradshaw, Mary McBride, Merica Nelson, Michael Forester, Jr., Michael Jenkins, Perry Cuthrell, Jr., Robert Tillman, Rodney Cobia, and Tonya Woods. *Compare* ECF No. 31-1 *and* ECF No. 31-6, *with* ECF No. 1-1. One of those Plaintiffs, Davie Richardson,

Exhibit 1 is a table that "identifies for each moving Plaintiff the version of the loan agreement he or she entered into with Defendants." *Id*. at 5. Two hundred and thirty Plaintiffs are listed on Exhibit 1. Many of these Plaintiffs are identified as having multiple contracts with TitleMax.

For example, Exhibit 1 states that Plaintiff Ethel Jenkins entered eight agreements with TitleMax of South Carolina: three on form "TITLEMAX-TITLEBUCKS-SC SUPERVISED LOAN AGREEMENT - V3.1 03.28.2018," two each on forms "TM-SC-SUPERVISED LOAN AGREEMENT - V.2.1-01.15.2016" and "TM-VA-MOTOR VEHICLE TITLE LOAN AGREEMENT - V.1.0-06.13.2011," and one on form "TM-VA-MOTOR VEHICLE TITLE LOAN AGREEMENT - V.2.1-02.22.2018." ECF No. 31-1, at 3. Plaintiffs attach copies of *other* agreements on these same forms, *see* ECF No. 31-3, and they ask the Court to compel arbitration in accordance with the terms in those other agreements. Plaintiffs do not, however, make any allegation or argument explaining which of these eight agreements they believe is controlling here. Plaintiffs also offer no evidence to authenticate Exhibit 1, including basic information such as the person or persons who created it.

That basic information is particularly important here because Exhibit 1 is inaccurate on its face. Exhibit 1 indicates that Ms. Jenkins, to continue

---

passed away over a month before Plaintiffs filed this lawsuit. *See* Att'y Andrew Brown's Ordered Supp. Br. at 1, ECF No. 20.

the example used above, allegedly executed agreements on Virginia forms ("TM-VA-MOTOR") with TitleMax of South Carolina. ECF No. 31-1, at 3. That is inconsistent with every contract Plaintiffs attach to their brief—all of those contracts with TitleMax of Virginia are on a Virginia form, *see, e.g.*, ECF No. 31-2, at 2, and all contracts with TitleMax of South Carolina are on a South Carolina form, *see, e.g.*, ECF No. 31-3, at 2. Exhibit 1 also shows that Ms. Jenkins supposedly entered a loan on "10/03/15" using a form dated "03.28.2018." *Id.* Plaintiffs do not—and cannot—explain how Ms. Jenkins could have entered a loan in October 2015 using a form not created until March 2018. Unsurprisingly, none of the contracts Plaintiffs attach to their brief was entered *before* TitleMax began using the relevant form. *See, e.g.*, ECF No. 31-2, at 2 (February 2018 form used for May 2018 contract).

Exhibit 6 is identified in Plaintiffs' brief as "NCDMV generated lien verifications." Pls.' Br. Supp. Mot. Compel at 11. Exhibit 6 appears to consist of pages printed from a N.C. Division of Motor Vehicles website on various dates between January 2019 and September 2019. These are not self-authenticating documents, and, as with Exhibit 1, Plaintiffs do not attempt to authenticate these printouts or even explain who created them. Exhibit 6 appears to suggest that 12 Plaintiffs own vehicles that are subject to a lien placed by TitleMax. Plaintiffs ask this Court to assume that these

10

Plaintiffs have some sort of arbitration agreement with TitleMax and to order some type of unspecified arbitration under that agreement.

## ARGUMENT

The Court should summarily deny Plaintiffs' Motion to Compel Arbitrations and Stay Proceedings because Plaintiffs do not even attempt to carry their burden of proving the existence of valid, enforceable, and applicable arbitration agreements. There is no record on which to compel arbitration and no evidence for TitleMax to rebut. Without cognizable evidence, the motion must be denied. Because the deadline for moving to compel arbitration has now passed, that denial should be with prejudice.

If Plaintiffs seek permission to file a second motion to compel, this time supported by the evidence they acknowledge they should have included with their first motion, the Court should deny that leave because Plaintiffs have lost any right to compel arbitration.

**I.      The Court Should Deny Plaintiffs' Motion with Prejudice Because Plaintiffs Failed to Show an Agreement to Arbitrate by the Deadline for Making That Showing**

Plaintiffs acknowledge that they bear the burden of "*prov*[*ing*] that the parties entered into a valid arbitration agreement," but they offer *no evidence* that could prove the existence of an arbitration agreement. *See* Pls.' Br. Supp. Mot. Compel at 5. This total failure to carry their initial burden is

11

fatal to their motion. It also prevents TitleMax from taking a firm position on whether it agreed to arbitrate claims with any given Plaintiff.

### A. Plaintiffs Make No Attempt to Carry Their Burden of Proof

"The party seeking to compel arbitration has the burden to prove that a valid arbitration agreement exists." *Greene v. OneMain Fin. Grp., LLC*, No. 1:17-cv-00848-LCB-LPA, 2018 WL 5831681, at *2 (M.D.N.C. Nov. 7, 2018). Specifically, the moving party must present "*credible, admissible evidence* to support a finding of an agreement to arbitrate." *Id.* (emphasis added); *see also Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017) (noting that a party "who seeks to compel arbitration under the Federal Arbitration Act bears the burden of establishing the existence of a binding contract to arbitrate the dispute").

The evidentiary standard "on a motion to compel arbitration is 'akin to the burden on summary judgment.'" *CIP Constr. Co. v. W. Sur. Co.*, No. 1:18-cv-00058-TDS-JLW, 2018 WL 3520832, at *4 (M.D.N.C. July 20, 2018) (quoting *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 91 (4th Cir. 2016)). The moving party therefore must present evidence in its proper, authenticated form because "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary

judgment." *Morales v. Holly*, No. 1:09-cv-00175-CCE-LPA, 2012 WL 4511068, at *3 (M.D.N.C. Sept. 28, 2012) (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)), *report and recommendation adopted*, 2012 WL 5348226 (M.D.N.C. Oct. 29, 2012).

Plaintiffs rely entirely on unsworn, unauthenticated documents to support their motion to compel arbitration. They attach various exhibits prepared by an unknown person at an unknown time that purport to show that all moving Plaintiffs (but not all Plaintiffs) have some kind of agreement to arbitrate with TitleMax. These exhibits—riddled with apparent errors[2]— have no evidentiary value. If anything, they are mere argument by counsel in a brief (not even carrying the weight of allegations in a Complaint), which cannot and "do not qualify as competent evidence for adjudicating" a "request to compel arbitration." *Scales v. SSC Winston-Salem Operating, Co., LLC*,

---

[2] For the avoidance of doubt, TitleMax denies that Exhibit 1 could be an accurate summary of TitleMax contracts. In the first ten lines of that exhibit alone, Plaintiffs allege that *two* Plaintiffs entered contracts in 2016 and 2017 using a form revised in 2018. Plaintiffs allege that Amanda Grooms entered a loan on "06/02/16" with TitleMax of *Virginia* using a TitleMax of *South Carolina* form dated "03.28.2018" and that Andrew Johnson entered a loan on "01/13/17" using a form dated "02.22.2018." ECF No. 31-1, at 2. Other examples are even worse; one Plaintiff purportedly entered a loan in 2010 with TitleMax of South Carolina using a 2018 TitleMax of Virginia form. *See* ECF No. 31-1, at 6 (alleging that Rodney Easterling entered a South Carolina loan on "06/21/10" using a "02.22.2018" Virginia form). These allegations are physically impossible.

13

No. 1:17-cv-00539-WO-LPA, 2017 WL 4467278, at *5 n.5 (M.D.N.C. Oct. 5, 2017).

The only potentially sufficient citation in Plaintiffs' brief is their reference to TitleMax's Answer. Plaintiffs note that TitleMax admitted "on information and belief that each of the agreements that exist between any Plaintiff and any Defendant contains an arbitration provision governing all the claims Plaintiffs assert." Answer ¶ 48, ECF No. 2; *see also* Pls.' Br. Supp. Mot. Compel at 4. Plaintiffs cannot rely on this admission to carry their evidentiary burden for two reasons.

First, TitleMax does not admit that any Plaintiff—much less all the moving Plaintiffs—have an agreement with TitleMax. To the contrary, TitleMax admitted that "each of the agreements *that exist*" contains an arbitration provision. Answer ¶ 48 (emphasis added). This admission is an acknowledgment that TitleMax's business practice is to include arbitration provisions in its agreements; it is not an admission that it executed any such agreement with any particular Plaintiff.

Second, even if TitleMax's Answer could establish that *some* arbitration agreement exists between a Plaintiff and TitleMax, it would not establish *what* agreement exists or the terms of that agreement. Specificity is required because "arbitration is a matter of contract, and courts must enforce arbitration contracts *according to their terms*." *Henry Schein, Inc. v. Archer*

14

& *White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (emphasis added). The Court must know what those terms are to decide, for example, whether the claims and counterclaims asserted in this lawsuit fall within their ambit and whether the parties must submit their dispute to AAA or some other arbitration provider.

While Plaintiffs fail to prove the existence of any specific agreement to arbitrate, they fail to even *identify* the terms of the purported agreements with the Plaintiffs listed in Exhibit 6. Those Plaintiffs argue that they have "no reason to believe their loan agreements are in any material respects different from the [ten] loan agreements attached [their brief] as Exhibit 3," and they "ask[] the Court to order arbitrations of their claims" according to some unknown terms. Pls.' Br. Supp. Mot. Compel at 11. It is not clear what, exactly, these Plaintiffs are asking the Court to order. It would be manifest error to accept Plaintiffs' invitation to invent an arbitration agreement out of whole cloth. *Cf. Henry Schein, Inc.*, 139 S. Ct. at 529 ("arbitration is a matter of contract").

B. **Plaintiffs' Failure to Present Evidence of Any Agreement to Arbitrate Prevents TitleMax from Unequivocally Admitting or Denying Whether That Agreement Exists**

Plaintiffs' failure to carry their evidentiary burden is so complete that it prevents TitleMax from taking a position on whether it has agreed to

arbitrate this dispute with any particular Plaintiff. Consider for example Plaintiff Andrew Johnson. TitleMax has searched its records and located a contract with a person named Andrew Johnson, and it has produced that contract to Plaintiffs as ordered by this Court. TitleMax believes that Plaintiff Andrew Johnson is the same person as the Andrew Johnson who contracted with TitleMax, but TitleMax is not certain that these Andrew Johnsons are the same person. It would not be a major coincidence for them to be different; the North Carolina State Board of Elections lists 137 active voter registrations in North Carolina for a person named Andrew Johnson, including 9 in Guilford County alone. *See* Voter Search, North Carolina State Board of Elections, https://vt.ncsbe.gov/RegLkup/ (enter "Andrew" in First Name field, "Johnson" in Last Name field, check "Registered" under Voter Status, and click Search) (returning 169 registrations, including 32 inactive registrations). The lack of evidence before the Court about Plaintiff Andrew Johnson and the lack of any discovery procedures prevents TitleMax from determining whether Plaintiff Andrew Johnson agreed to arbitrate his disputes with TitleMax.

The same is true for all of the moving Plaintiffs—TitleMax has at least some reason to believe it entered a contract containing an arbitration provision with a person who has the same name as each of the moving Plaintiffs, but it does know whether it in fact entered such a contract.

16

Plaintiffs must provide that certainty by presenting credible, admissible evidence; they cannot rely on vague, unsworn arguments, particularly given that it was Plaintiffs who chose to litigate their claims by filing a lawsuit.

In short, TitleMax cannot "unequivocally" admit or deny that any agreement to arbitrate exists. *Greene*, 2018 WL 5831681, at *2; *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."); *Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 564 (4th Cir. 2015). While TitleMax believes that it probably did enter arbitration agreements with many Plaintiffs in this lawsuit, it cannot unequivocally admit or deny that any particular Plaintiff made an agreement to arbitrate. That inability arises from Plaintiffs' failure to carry their initial burden.

### C. The Deadline for Moving to Compel Arbitration Has Now Passed

Plaintiffs' failure to carry their evidentiary burden of showing that each Plaintiff agreed to arbitrate all claims at issue is fatal to their motion to compel arbitration,[3] and it is dispositive of Plaintiffs' efforts to avoid a

---

[3] Plaintiffs cannot, of course, attempt to carry their evidentiary burden for the first time by attaching evidence to their reply brief. *See, e.g.*, Local Rule 7.3(e) ("When allegations of facts not appearing of record are relied upon to support a motion, affidavits, parts of depositions, and other pertinent documents then available shall accompany the motion or related brief.").

decision by this Court on the merits. This Court's scheduling order allowed Plaintiffs until "**September 30, 2019** to file a motion to compel arbitration." Sept. 19, 2019, Order at 3 ¶ 1. Even if Plaintiffs could theoretically file a second motion to compel arbitration, they cannot file that second motion here because the deadline has now passed.

## II. Evidentiary Failings Aside, Any Plaintiff That Had a Contractual Right to Arbitrate Has Lost That Right

A properly supported motion to compel arbitration would be futile because Plaintiffs forfeited any right to arbitrate by filing this lawsuit. The Federal Arbitration Act provides that agreements to arbitrate are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Where the grounds for revocation "relate specifically to the arbitration clause and not just to the contract as a whole," the Court may determine whether the party seeking to compel arbitration has lost any right to arbitrate because it has "materially breached the arbitration agreement." *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (holding that federal courts may consider "issues relating to the making and performance of the agreement to arbitrate").

Virginia and South Carolina law govern the question of whether Plaintiffs materially breached any arbitration provisions at issue. Those

states' laws govern interpretation of the contracts because, "[a]s a federal court sitting in diversity, this Court is bound to apply the conflict-of-laws rules of the state in which it sits." *Vincent v. Vick*, No. 1:17-cv-00762-LCB-JEP, 2018 WL 3827636, at *3 n.4 (M.D.N.C. Aug. 10, 2018). "North Carolina applies the rule of *lex loci contractus*, which 'mandates that the substantive law of the state where the last act to make a binding contract occurred . . . controls the interpretation of the contract.'" *Id.* (quoting *Fortune Ins. Co. v. Owens*, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000)); *accord Cole v. Champion Enterprises, Inc.*, 305 F. App'x 122, 128 n.8 (4th Cir. 2008) ("Under North Carolina law, the principle of *lex loci contractus* applies to choice-of-law decisions in contract cases; therefore, we apply the law of the state where the last act essential to a meeting of the minds occurs.").

Here, assuming that the moving Plaintiffs all have or had contracts with TitleMax—a fact yet unproven—all of the material acts necessary to form the contracts at issue took place in Virginia or South Carolina.[4] The contracts all also contain choice-of-law provisions selecting Virginia and

---

[4] Plaintiffs attach 11 unauthenticated agreements to their brief. Those contracts were executed in Bennettsville, South Carolina, *see* ECF No. 31-3, at 5, 8; Fort Mill, South Carolina, *see* ECF No. 31-3, at 11, 23, 43; Gaffney, South Carolina, *see* ECF No. 31-3, at 28, Rock Hill, South Carolina, *see* ECF No. 31-3, at 2; Chesapeake, Virginia, *see* ECF No. 31-3, at 15; Danville, Virginia, *see* ECF No. 31-3, at 19; or Martinsville, Virginia, *see* ECF No. 31-2, at 2; ECF No. 31-3, at 35.

South Carolina law.[5] *Cf. Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 601 (4th Cir. 2004) (noting that "the presumptive rule of *lex loci contractus,* that is, the interpretation of a contract is governed by the law of the place where it was made," may "be overcome by the presence of a choice-of-law provision in a contract"). The Court should therefore apply Virginia and South Carolina law to the issue of prior material breach. *Accord Strange v. Select Mgmt. Res., LLC*, No. 1:19-cv-00321-CCE-JEP, 2019 WL 5268649, at *4 (M.D.N.C. Oct. 17, 2019) (interpreting contracts under South Carolina and Virginia law where contracts were executed in those states and contained South Carolina and Virginia choice-of-law provisions).[6]

Under Virginia and South Carolina law, "a party who commits the first breach of a contract is not entitled to enforce the contract." *Horton v. Horton*, 254 Va. 111, 115, 487 S.E.2d 200, 203 (1997); *Langston v. Niles*, 265 S.C. 445, 457, 219 S.E.2d 829, 834 (1975) (holding that a plaintiff's breach "was

---

[5] Specifically, the contracts provide that the arbitration provisions are governed by federal law and the contracts by either South Carolina or Virginia law. *See* ECF No. 31-3, at 6 ("laws of the State of South Carolina"); ECF No. 31-3, at 9 (same); ECF No. 31-3, at 12 (same); ECF No. 31-3, at 24 (same); ECF No. 31-3, at 46 ¶ 22 ("South Carolina law"); ECF No. 31-3, at 31 ¶ 22 (same); ECF No. 31-3, at 3 ("laws of the State of South Carolina"); ECF No. 31-3, at 16 ("laws of the State of Virginia"); ECF No. 31-3, at 21 (same); ECF No. 31-2, at 5 ¶ 22 ("Virginia law"); ECF No. 31-3, at 38 ¶ 22 (same).

[6] While the *Strange* Court ultimately granted the plaintiffs' motion to compel arbitration, that Court did not consider either of the issues presented here: Plaintiffs' failure to carry their burden, and their breaches of any agreements to arbitrate.

the first breach and he is deprived of the right to complain of a subsequent breach by defendant").  To relieve the other party of its obligations, this first breach must be material—that is, the breach must be "a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton*, 254 Va. at 115, 487 S.E.2d at 204; *see also Hooters of Am., Inc.*, 173 F.3d at 940 (explaining that rescission of an arbitration agreement will be granted under South Carolina law for "breaches which defeat the object of the contracting parties" (quoting *Rogers v. Salisbury Brick Corp.*, 299 S.C. 141, 144, 382 S.E.2d 915, 917 (1989))).

Here, Plaintiffs argue that they entered contracts in which they agreed to submit all relevant disputes with TitleMax to individual arbitration.  *See* Pls.' Br. Supp. Mot. Compel at 7–9; *accord* Compl. ¶ 48 (alleging the existence of "arbitration provision[s] which cover all of the claims asserted herein"). Plaintiffs also attach contracts to their brief in which the consumer agreed to "give up my right to . . . [j]oin a Dispute I have with a dispute by other consumers."  ECF No. 31-2, at 6.[7]  The term "Dispute" is broadly defined to

---

[7] *Accord* ECF No. 31-3, at 26; ECF No. 31-3, at 32; ECF No. 31-3, at 39; ECF No. 31-3, at 47.

include "all claims and disagreements related to . . . the Loan, or [the consumer's] dealings with Lender."  ECF No. 31-2, at 5.[8]

The essential purpose of the arbitration clauses Plaintiffs rely on is to resolve claims through individual arbitration—not to engage in expensive, time-consuming, public litigation involving hundreds of parties.  Plaintiffs chose to pursue the latter path when it was convenient for them.  In doing so, Plaintiffs eschewed the premise of arbitration; they have brought a public action, allowing their counsel to use the lawsuit to draw media attention and thereby secure additional clients; and they engaged in protracted, time-consuming, and expensive motion practice that was unnecessary and avoidable had Plaintiffs entered into the tolling agreement that TitleMax offered.

Plaintiffs' breach of the alleged arbitration provisions has benefitted Plaintiffs by allowing them to pursue one, consolidated action in their forum of choice; it has benefitted their counsel by putting a spotlight on their cottage industry of suing out-of-state lenders in North Carolina; and it has prejudiced TitleMax by depriving it of the benefits of individual arbitration. As such, Plaintiffs have forfeited any (unproven) right they may have once had to compel arbitration.

---

[8] *Accord* ECF No. 31-3, at 25; ECF No. 31-3, at 31; ECF No. 31-3, at 38; ECF No. 31-3, at 46.

In claiming otherwise, Plaintiffs rely on cases in which the *defendant* moved to compel arbitration of claims filed by a *plaintiff*. *See* Pls.' Br. Supp. Mot. Compel at 10–11 (citing *Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625, 627 (2d Cir. 1945) & *Batson Yarn & Fabrics Mach. Grp., Inc. v. Saurer-Allma GmbH-Allgauer Maschinenbau*, 311 F. Supp. 68, 69 (D.S.C. 1970)). Here, by contrast, *Plaintiffs* filed a lawsuit and then *Plaintiffs* moved to compel arbitration of ***their own*** claims. *Cf. Galion Iron Works & Mfg. Co. v. J.D. Adams Mfg. Co.*, 128 F.2d 411, 413 (7th Cir. 1942) ("Plaintiff could have sought arbitration but it exercised its option of bringing suit. By its election, it waived its right to arbitration."). Plaintiffs chose a judicial forum for their claims even though TitleMax had not refused to arbitrate any claims—to the contrary, it had insisted on arbitration, it offered a tolling agreement to avoid any need for Plaintiffs to take the drastic step of filing individual suits, much less to engage in obvious breach behavior by pursuing a mass action, and it fully participated in all arbitrations in which arbitration papers were filed in advance of any court proceedings.

Now that Plaintiffs have publicly accused TitleMax of violating North Carolina law in a case involving hundreds of Plaintiffs, TitleMax exercises its right to defend itself publicly against those baseless allegations. Only a ruling by this Court can undo the reputational and other damage that Plaintiffs have done by filing this public mass action. *Cf.* Bradon, *North*

*Carolina Residents Allege TitleMax of South Carolina Charged Excessive Interest Rate.* Individual decisions in private arbitrations cannot right this breach and prejudicial wrong.

## CONCLUSION

The Court should deny Plaintiffs' Motion to Compel Arbitrations and Stay Proceedings.

Respectfully submitted this the 21st day of October, 2019.

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Samuel B. Hartzell
Christopher W. Jones, N.C. Bar No. 27265
Samuel B. Hartzell, N.C. Bar No. 49256
Scott D. Anderson, N.C. Bar No. 49044
555 Fayetteville St., Suite 1100
Raleigh, NC 27601
Telephone: (919) 755-8173
Facsimile: (919) 755-6180
Email: Chris.Jones@wbd-us.com
Sam.Hartzell@wbd-us.com
Scott.D.Anderson@wbd-us.com

*Counsel for Defendants/Counter-Claimants TitleMax of Virginia, Inc., TitleMax of South Carolina, Inc., and TMX Finance of Virginia, Inc.*

## CERTIFICATE OF WORD COUNT

I certify under Local Rule 7.3(d)(1) that the body of this brief, headings, and footnotes together contain 6,250 words or fewer, as reported by the word count feature in Microsoft Word 2016.

This the 21st day of October, 2019.

/s/ Samuel B. Hartzell
Samuel B. Hartzell

## CERTIFICATE OF SERVICE

I certify that I electronically filed this brief with the Clerk of Court using the CM/ECF system.

This the 21st day of October, 2019.

/s/ Samuel B. Hartzell
Samuel B. Hartzell