# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-19-0001-3828

Stanley Bernard Ewings

Claimant

-vs-

TitleMax of Virginia, Inc.

Respondent

# AWARD OF ARBITRATOR

### A. Background

Claimant (Ewings) seeks compensatory, statutory, and treble damages, along with interest and costs, including legal fees, from TitleMax of Virginia, Inc. (TitleMax). Ewings also seeks a declaration that his three loan agreements with TitleMax are unenforceable, to the extent any remains susceptible to enforcement.

Ewings along with other plaintiffs sued TitleMax and other defendants in North Carolina Superior Court. The suit was removed to federal court in North Carolina, which compelled arbitration.

Ewings filed his Demand on May 3, 2019. The Demand names Greensboro, North Carolina as "the requested city and state for the hearing if an in-person hearing is held." On June 2, 2020, TitleMax filed its Response.[1]

At the August 31, 2020 Preliminary Hearing, TitleMax asked for a reasoned award. Ewings had no objection, and the Scheduling Order (SO) of the same date specifies a reasoned award. The

---

[1] Why more than a year elapsed between the Demand and Response is not clear from information provided to the Arbitrator. The Response alleges TitleMax had not yet been served with the Demand, but filed its Response "in an abundance of caution." The Response also alleges the AAA "reopened Claimant's previously-filed Demand …," and implies this happened after and presumably in response to the order compelling arbitration. Neither party argues that the gap between Demand and Response is significant to the outcome here, and the Arbitrator notes this apparent history largely as context for the year+ gap.

evidentiary hearing (Hearing) proceeded by videoconference on October 23, 2020. Each party made both pre- and post-Hearing submissions, all as provided in the SO and orders supplementing it.

## FINDINGS OF FACT

Based upon the documentary information; witness testimony, including any credibility determinations the Arbitrator found necessary to resolve; pleadings; and other submissions by the parties, the Arbitrator finds the facts on which his Conclusions of Law rest to be as follow below. Except where dates are stated, all facts are found as of all times relevant to the Conclusions of Law:

1. Ewings lives in Greensboro, North Carolina. He owns a 2001 GMC Yukon SUV (the Vehicle). TitleMax makes loans to individual at, in market terms, high rates of interest and secured by the borrower's title to a motor vehicle (Title Loans). TitleMax has numerous offices in states other than North Carolina, including Virginia and South Carolina. Because North Carolina does not permit Title Loans on the terms TitleMax makes them, it has no office in North Carolina.

2. On the strength of his title to the Vehicle, provided as security for each, TitleMax made Ewings three loans: (a) a $1,115.00 loan originated on November 11, 2015; (b) a $1,132.00 loan originated on December 6, 2016; and (c) a $920.00 loan originated on April 14, 2018 (each a Loan and together "the Loans"). TitleMax disbursed to Ewings the stated amount loan amount less $20.00. The $20.00 covered the fee TitleMax paid to the North Carolina Department of Motor Vehicles (DMV) to record and thus perfect a lien against Ewings's title to the Vehicle.

3. Ewings paid TitleMax a total of $5,083.66 in respect of the Loans.

4. Ewings learned about TitleMax through acquaintances. Before traveling to a TitleMax office in Danville, Virginia, as he did to close each of the Loans, Ewings placed a phone call to TitleMax while in Greensboro.[2] During that call, a TitleMax representative told Ewings that, based on his statements about the Vehicle, he appeared to be eligible for a TitleMax loan, and directed him to bring the Vehicle to a TitleMax office.

5. As a general matter, based on evidence unrefuted by TitleMax, its representatives assured North Carolina callers they would receive a loan if they could produce, at a TitleMax location, both an operable vehicle and title to it. There is no evidence TitleMax refused a loan to any prospective borrower who met these conditions. If callers related they could meet these conditions, their TitleMax counterpart would direct them to travel to a TitleMax office to

---

[2] It is not clear whether, after the first loan, Ewings called ahead or just went to the TitleMax office to pursue the second and third of the Loans. The difference is immaterial: Ewings learned during the first call that he was, according to TitleMax, a candidate to receive a loan, and after the first loan he understood what was involved in obtaining another.

13535399v1 26882.00015

conclude the transaction. The loan amount TitleMax would specify depended on its evaluation, at its office, of the value of the vehicle to serve as security.

6. It was TitleMax' practice, when callers inquired about a loan, to determine the caller's state of residence in order to specify what documents TitleMax would need should the caller opt to visit one of its locations to pursue a car title loan. The representative with which Ewings spoke asked him his state of residence. Ewings said North Carolina, and the representative and told him what documents to bring to TitleMax.

7. TitleMax, as part of its marketing and sales efforts, routinely calls prior North Carolina residents who have borrowed from it before, or whose contact information it has otherwise obtained, to solicit new Title Loans. The Danville, Virginia TitleMax office made many loans to North Carolina residents, according to some unrefuted evidence more than to Virginians, and other unrefuted evidence is to the same effect regarding TitleMax operations in South Carolina – active solicitation of prospective borrowers known by TitleMax to be resident in North Carolina, and a volume of loan origination to North Carolinians at or above the rate to residents of the state where the TitleMax office is located. TitleMax also mailed to at least one North Carolina borrower written offers of $100 as a referral fee for each new borrower directed to TitleMax.

8. Ewings offered evidence, unrefuted by TitleMax, that while certain documents TitleMax asked him to sign appeared to provide for notarization, Ewings did not interact with anyone he understood to be a notary who appeared to be functioning in that capacity, and did not witness notarization of his signature. This was apparently the case for each of the Loans. Other evidence offered by Ewings, and unrefuted by TitleMax, was that a former TitleMax employee and notary was routinely called upon by TitleMax to notarize signatures on documents affixed elsewhere, by persons she had not met, from whom she had not obtained and could not obtain identification, and whose signatures she had not witnessed. The notary did not claim to have been asked to notarize, or to have notarized, Ewings's signature in particular.

9. For each of the Loans, Ewings and TitleMax each executed a Motor Vehicle Title Loan Agreement (Agreement) on a TitleMax form. Ewings signed each Agreement while at the TitleMax office in Danville. His signature appears to have been effected electronically rather than by manuscript or "wet" signature.

10. Each Agreement asserts a right of TitleMax to recover from Ewings "the reasonable costs of repossession and sale of the … Vehicle after [a] default," citing a Virginia statute. The Agreement states that it shall be governed by Virginia law.

11. Each Agreement contains an arbitration clause. That clause says "[t]he arbitrator shall apply applicable substantive law consistent with the [Federal Arbitration Act]" and that "[t]he arbitration hearing shall be conducted in the county of [Ewings's] residence," a county within 30 miles of that county, the county in which the transaction under the Agreement occurred, or "in such other place as shall be ordered by the arbitrator."

13535399v1 26882.00015

12.     The Hearing was conducted, for all relevant purposes, "in" Greensboro, Guilford County, North Carolina.  This arbitration proceeding and the related litigation (discussed above) originated and proceeded, at all times, in North Carolina.

13.     With respect to each of the Loans, TitleMax, directly or through an intermediary arranged by it, placed a lien on the Vehicle title, via filing(s) with DMV.

14.     TitleMax sent Ewings payments reminders by text message, as it commonly did with other North Carolina borrowers.  Ewings made payments to TitleMax via Western Union, through one or more of its locations in North Carolina.

15.     At 1:05 A.M. on November 19, 2018, Unlimited Asset Recovery, LLC (Unlimited) of McLeansville, North Carolina, a firm acting for TitleMax, "recovered" (as the firm's document reflects) the Vehicle from 2200 Linda Lane in Greensboro, the address shown for Ewings in the Agreements.  This recovery or repossession was in response to Ewings's default under the last (April 14, 2018) of the Loans.  Ewings had satisfactorily fulfilled the terms of the first two Loans. TitleMax had, prior to making the second and third Loans, released by filings with or communications to DMV the security interest in the Vehicle it had perfected in respect of each preceding Loan.

16.     Unlimited moved the Vehicle to a location in Guilford or Alamance County, North Carolina.  By a November 19, 2018 notice to Ewings, TitleMax advised that it would sell the Vehicle after December 4, 2018 unless Ewings paid:

[T]he full amount [he] owe[d] (not just the past due payments), including our expenses, which is:

   Principal: $827.82

   Charges:   $150.94

   Expenses:  $350.00

17.     Ewings paid, in Guilford or Alamance County, the amount demanded by TitleMax to redeem the Vehicle, and it was returned to him.

## CONCLUSIONS OF LAW

1.     Ewings has two lines of legal argument.  The first is that each Loan is subject to, and violated, N.C. Gen. Stat. § 53-164 *et seq.* (the N.C. Consumer Finance Act, or CFA[3]) or, alternatively, N.C.G.S. § 24-2.1 *et seq.*, (the Usury Act), statutes specifically targeting types of loan or loan terms.  The second is that TitleMax is subject to and exposed to damages under N.C. Gen. Stat. § 75-1.1 *et seq.* (the Unfair and Deceptive Trade Practices Act, or UDTPA).  The

---

[3] N.C. Gen. Stat. § 53-190, the "Loans Made Elsewhere" component of the CFA, is a particular focus of the Parties' arguments.

13535399v1 26882.00015

UDTPA argument also has two parts, as the Arbitrator understands the argument. The first is that if Ewings is entitled to money under the CFA or Usury Act, or both, that amount is subject to trebling under the UDTPA, because violation of the CFA or Usury Act, on these facts, would as a matter of law violate the UDTPA. The second is that acts violating the CFA or Usury Act, on these facts, support both compensatory and treble damages under the UDTPA itself (whether or not compensatory relief is, or is also, available to Ewings under the CFA or Usury Act)

2. TitleMax also has two main arguments. The first is that Virginia law solely controls its Loans to Ewings, and that the Loans and TitleMax' activities in respect of each are lawful under Virginia law. The second is that if North Carolina law is determined otherwise to apply in favor of Virginia law, that North Carolina law purporting to apply to "loans made elsewhere" is unconstitutional – and that nothing in valid North Carolina law, at least those laws at issue, provides a basis for relief to Ewings.

3. Ewings seeks damages in respect each of his three TitleMax loans at issue. TitleMax has objected to consideration of the first two, arguing that Ewings did not make either a subject of his Demand. The Arbitrator agrees that TitleMax produced to Ewings disbursement and payment detail on all three Loans, without apparent objection. TitleMax' principal challenges are legal rather than factual anyway, and do not vary as to any of the Loans. To the extent the Demand is not clear what Loan or Loans Ewings challenges (and the Arbitrator need not and does not make a determination about that), TitleMax was not prejudiced. As such, the Arbitrator rejects TitleMax' argument that only the most recent Loan is properly before him.

4. TitleMax also asserts affirmative defenses based on the statutes of limitations. The Arbitrator determines that no allegation or claim of Ewing is barred by any limitations statute or principle.

5. The CFA purports to regulate certain loan contracts "made outside this State." It excepts "loan contracts in which all contractual activities … occur entirely outside North Carolina," and contains a non-exclusive ("including") list of "contractual activities."

6. The CFA is not the only North Carolina statute that purports to govern contracts that may have been "made" outside the State, partly (perhaps substantially) performed outside it, or both. Others include N.C. Gen. Stat. §§ 22B-2 (declaring "void and against public policy" provisions "in any contract, subcontract, or purchase order for the improvement of real property in this State" that specify non-N.C. law or an "exclusive forum" other than N.C.) and 66-193 (voiding any "provision in any contract between a sales representative and a principal purporting to waive any provision of this Article, whether by expressed waiver or by a contract subject to the laws of another state").

7. Each Agreement was a "loan contract" within the meaning of the CFA. Each Agreement both contemplated by its terms and required for its performance "contractual activities" inside North Carolina. These included the recording by TitleMax (directly or indirectly) of a security interest in the State, the release by TitleMax of that security interest upon borrower fulfillment of the Agreement, and a remedy of vehicle repossession contemplated to occur, if pursued, in the

13535399v1 26882.00015

State.  TitleMax in fact directly or through its third party representative entered the State to effect repossession of the Vehicle, on the strength of its recorded claim to title of the vehicle.  It then effected its possession of the Vehicle in the State, received payment from Ewings for redemption of the possessed vehicle in the State, and returned possession to him in the State.

8.      The Arbitrator treats the CFA and Usury Act as constitutional.  There are three main reasons for this.  The first is that statutes are presumptively constitutional, and the Arbitrator is aware of no judicial decision declaring the CFA or Usury Act unconstitutional.  The second is that the Arbitrator is reluctant to assume authority to treat, much less declare, a statute unconstitutional when no court with jurisdiction appears to have done so.  Granting arbitral awards not to represent binding precedent either for courts or arbitrators, both parties have referred to and in some cases provided to the Arbitrator, as persuasive devices, arbitral awards in other matters implicating the legal issues in play here.  The Arbitrator is particularly reluctant to roam into constitutional jurisprudence on the chance the award may be offered to and found to be persuasive by another arbitrator. The third is that, as noted above, the "loans made elsewhere" features of the CFA and Usury Act are not unique in purporting to impose North Carolina law on contracts that specify other law or that would, if *lex loci contractus* choice-of-law analysis was dispositive,[4] avoid North Carolina law.  A determination that may have or, again, be argued or asserted to have repercussions for North Carolina statutes distinct from those at issue here is another reason to avoid constitutional challenges.

9.      Each Loan is subject to and violated the CFA. The Arbitrator applies North Carolina choice of law analysis, because North Carolina is the venue for this proceeding.

10.     TitleMax does not argue that any of the Loans conformed to either the CFA or the Usury Act.  Assuming the Loans and TitleMax' activities with respect to them to have been lawful under Virginia law, that law offends North Carolina public policy as expressed in the CFA and Usury Act, and the Arbitrator on that basis declines to apply Virginia law.

11.     The Arbitrator separately concludes that the Agreements and Loans necessarily required, and actually involved, "contractual activities" contemplated by the terms of the Agreements to occur or that in fact occurred inside North Carolina.  As an initial matter, the Arbitrator rejects the argument that § 53-190 defines "contractual activities" to include only "activities" through the point of execution by the Parties of the Agreements.  The "contractual activities" described in the statute are expressed in exemplary rather than exclusive or comprehensive terms, and include activities that necessarily occur after an agreement to lend has been achieved, for example "delivery and receipt of funds."

12.     Taking "contractual activities" to mean activities necessary to effect the terms of the Agreements, some of those activities necessarily had to occur, and were in fact effected, within North Carolina.  Indeed, the ability of TitleMax to effect and to perfect its security interest on the Vehicle, by interaction with the DMV and following the requirements that agency and North

---

[4] If dispositive and if that analysis, of itself, implicated law other than that of North Carolina.  As stated elsewhere in this Award, the Arbitrator makes no determination in what State any of the Loans was "made."

13535399v1 26882.00015

Carolina law prescribe – that is, to pursue "activities" in North Carolina - are by all accounts but-for conditions to its willingness and commitment to lend. Ewings presented evidence suggesting a history of at least hundreds of car title loans by TitleMax to North Carolina residents, each with the same interaction with DMV as for the Loans.

13. TitleMax also "c[ame] into this State to solicit or otherwise conduct activities" in regard to loans on terms that violated the CFA. These "activities" include repossession or "recovery" activities by TitleMax or others acting at its direction and active text and telephone solicitation for new loans of persons TitleMax knew to be in and residents of this State, for transactions that would, if consummated, necessarily require TitleMax to reach back into North Carolina to perfect its security.

14. In summary, each of the Loans was subject to and violates offends the CFA and thus the UDTPA.[5] Ewings is entitled to principal compensation as provided below both under the CFA and as compensatory damages under the UDTPA.

15. To the extent any of the Agreements remains subject to enforcement by TitleMax, or any of the Loans subject to collection activity, by operation of this Award each Agreement is deemed invalid and unenforceable. TitleMax may not pursue any collection activity or take or permit to be taken any action or report, such as an adverse credit report, as to Ewings in respect of any of the Agreements or Loans.

Based upon these Findings of Fact and Conclusions of Law, the undersigned Arbitrator makes the following award:

1. Ewings is awarded $5,083.66 as principal compensation from TitleMax. This amount reflects the Arbitrator's resolution of disputed evidence and arguments regarding the amount properly at issue between the Parties. This amount shall bear interest at the North Carolina legal rate of 8% per annum from May 3, 2019;[6]

2. Ewings's principal compensation is trebled under the UDTPA. As such, the total principal amount due from TitleMax to Ewings is $15,250.98. Of that total, $10,167.32 shall bear interest at the North Carolina statutory rate of 8% from the date of this Award until paid;

3. Neither Party shall receive attorney's fees or other monetary relief from the other;

4. To the extent punitive damages have been requested, they are denied.

The administrative fees of the American Arbitration Association (AAA) totaling $2,650.00 and the compensation of the arbitrator totaling $2,500.00 shall be borne as incurred.

---

[5] The Conclusions of Law as to the CFA obviate the need to reach Conclusions of Law as to the Usury Act.
[6] The date of the Demand. The Arbitrator was unable to determine any other date(s) on which pre-Award interest might appropriately be deemed to have begun on all or portions of the principal compensation amount.

13535399v1 26882.00015

The above sums are to be paid on or before 30 days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration. All claims and requests for relief, of any kind, not expressly granted or denied elsewhere in this Award are denied.

| December 8, 2020 | |
|---|---|
| Date | Edward F. Hennessey, Arbitrator |

13535399v1 26882.00015