|  |  |  |
|---|---|---|
| Stanley Bernard Ewings, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Claimant, | | |
| v. | | CLAIMANT'S ARBITRATION SUBMISSION |
| TitleMax of Virginia, Inc. | | |
| Respondent. | | |

NOW COMES Claimant Stanley Bernard Ewings, through his counsel, and respectfully submits this Brief and accompanying Exhibits in support of his claims in this arbitration proceeding.

## STATEMENT OF THE FACTS AND STATEMENT OF THE CLAIMS

Claimant is a citizen and resident of North Carolina. Respondent is a car title loan lender organized and existing under the laws of the state of Delaware. Respondent maintains loan-making offices in Virginia. Claimant obtained three car title loans from Respondent. Those loans are the subjects of this arbitration proceeding. Copies of the loan agreements are attached hereto as Exhibit 1. The first loan was originated on November 11, 2015 for the principal amount of $1115.00. The second loan was originated on December 6, 2016 for the principal amount of $1132.00. The third loan was originated on April 14, 2018 for the principal amount of $920.00.

1

A "car title loan" is a short-term loan product that is secured by the title to the borrower's motor vehicle. Car title lenders charge extremely high annual rates of interest that greatly exceed the interest rates allowed under the North Carolina lending laws. These rates of interest are typically well in excess of 100% per annum. In Claimant's case, Respondent charged him an annual percentage rates of 155.90%, 155.6912% and 180.2675%. (Loan Agreements attached as Exhibit 1) At no time did Claimant know that loans bearing these rates of interest are unlawful and Respondent did not inform him of this fact.

The legal question of whether an out-of-state predatory lender like Respondent can make and then collect on usurious loans from North Carolina residents has already been addressed by the North Carolina trial courts: The North Carolina Business Court rejected and enjoined an out-of-state lender's efforts to do exactly that. *State v. Western Sky Fin., LLC*, 2015 NCBC 84 (2015)[1] (Exhibit 2) Moreover, in a recent case North Carolina Superior Court Judge Richard S. Gottlieb in *Kym Michelle Koontz, et al. v. F&B Financial Services, LLC* (Guilford County 19 CVS 5900)(Exhibit 3) found that the lender's in-state loan making activities in that case (which are identical to the in-state conduct of Respondent here) were sufficient for the Court to conclude that the lender had purposefully availed itself of the privilege of conducting business in North Carolina. (Exhibit 3, ¶ 53).

---

[1] In that case an out-of- state lender, Western Sky Financial, LLC, was attempting to collect from North Carolina residents on interest rates between 89% and 342% APR. Like Respondent here, the lender in that case argued that the dormant Commerce Clause made North Carolina's Consumer Finance Act unconstitutional. The Court rejected that argument and enjoined the lender from further activities in North Carolina.

Case 1:19-cv-00489-LCB-JLW   Document 109-1   Filed 01/12/21   Page 2 of 30

To reach that conclusion the Court found that the lender had, among other things, solicited borrowers for car title loans, discussed and offered loans to North Carolina residents over the telephone, used the NCDMV to perfect security interests and repossessed vehicles in North Carolina. That conduct, which Respondent engaged in here, also triggers liabilities under the North Carolina Consumer Finance Act and, as will be shown herein, the North Carolina Consumer Finance Act applies to out of state loans of the type at issue <u>because the Act actually says that it does.</u>

Our appellate courts have not yet addressed and resolved the issue primarily because of the arbitration provisions Respondent has included in its loan agreements.[2] Claimant's undersigned counsel has attempted - without success - to have Respondent waive such provisions in a case so that the matter can be resolved by the North Carolina courts. Respondent instead is forcing these matters to be heard on a case-by-case basis before various individual arbitrators, all at great expense to both sides. These expenses are the result of Respondent's unwillingness to have the North Carolina Supreme Court decide the issue. Various arbitrators to date have weighed in with varying opinions on the claims asserted against Respondent and the counterclaims Respondent has asserted back against North Carolina residents but, of course, an arbitrator's opinion has no precedential value.

---

[2] A Delaware appellate court, however, has enforced an arbitrator's award which found for the consumer in three separate arbitrations where the same legal question was at issue— that is affirmative claims by an in-state borrower (Pennsylvania) using an in-state (Pennsylvania) statute against an out- of- state loan company (Delaware) where the contracts were signed in another state (Delaware). *See Auto Equity Loans of Delaware, LLC v. Baird, et al.* (No. N18A-08-001-DCS, Superior Court of Delaware, September 20, 2019) (Exhibit 4)

3

As a result, the issue remains unresolved to date.

Here, Respondent solicited Claimant for the loan, discussed the loan with him, offered the loan to him and received his acceptance of the loan offer all at a time when he was physically present in the state of North Carolina. (Affidavit of Stanley Ewings, Exhibit 5) At all times relevant to the making of the car title loans at issue, Respondent had actual knowledge that Claimant was a resident of North Carolina. (Exhibit 1 - Loan Agreements) Respondent used the North Carolina Department of Motor Vehicles to perfect a security interest in Claimant's automobile by recording liens in its favor on the title to that motor vehicles. Respond thereafter re-entered North Carolina and seized Claimant's car. (Affidavit of Stanley Ewings, Exhibit 5 and repossession attachments). Respondent then illegally and criminally notarized the document and used that fraudulent notarization to attach a lien on the vehicle and then come take the vehicle from North Carolina.

Respondent's former employee Darren Medley has declared (Exhibit 6) under penalty of perjury that during telephone conversations with prospective North Carolina borrowers Respondent would routinely:

1) Ask the prospective borrower where they live.

2) Ask for information concerning the borrower's motor vehicle, such as year, make, model, mileage and condition.

3) Ask the borrower how much money he or she wanted to borrow.

4) If the value of the borrower's car supported the amount sought that Respondent "probably" could make them a loan in the amount being requested.

5) Offer the loan to the borrower and then instruct them to drive to the store in

4

Virginia.

(Exhibit 6 at ¶ 6)

Respondent and its affiliates also regularly and as a matter of intended business practices solicit, discuss, make loan offers and receive acceptances of those offers from North Carolina residents. (Affidavit of Respondent's former employee Jessica Crowley, Exhibit 7). Respondent's former employee Darren Medley has declared that as part of Respondent's marketing and sales program Respondent routinely calls its former borrowers, included North Carolina residents for the purpose of selling them additional loans. (Exhibit 6 at ¶ 7)

In this arbitration proceeding, Claimant brings claims for compensatory damages under the North Carolina Consumer Finance Act, N.C.G.S. § 53-164, *et seq.* (hereinafter "the Act') and treble damages pursuant to N.C.G.S. §75-1.1 in connection with his claims pursuant to the Act. Plaintiff also brings an alternative claim under the North Carolina usury statute, N.C. Gen. Stat. § 24-2.1, *et. seq.* Act.

## SUMMARY OF THE DISPUTE

The North Carolina Consumer Finance Act without question applies to the conduct and activities of Respondent with regard to the car title loan at issue. The North Carolina Legislature expressly chose to make the Act apply to situations like the one before the Arbitrator. The Act, at N.C.G.S. § 53-190(a)( "Loans Made Elsewhere') provides: "[n]o loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or

5

received, shall be enforced in this State." The highest rate of interest permitted by N.C.G.S. § 53-176 (a) is 30% per annum on loans in the principal amount of $4000.00 and less.

To avoid application of the Act, car title loans "made elsewhere" must meet the requirement that "all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds occur entirely outside North Carolina." N.C.G.S. § 53-190(a).

Further, the Act, at N.C.G.S. § 53-190(b), provides: "[i]f any lender or agent of a lender who makes loan contracts outside the State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article." When measured against the record evidence in this arbitration proceeding, the Act clearly applies.

**ARGUMENT**

**I.      North Carolina Law Governs The Particular Claims Being Asserted.**

The Federal Arbitration Act and case law interpreting the Act provide little guidance as to the choice of law analysis the Arbitrator should undertake. However, the Arbitrator is sitting in lieu of a North Carolina judge and the Arbitrator should employ the same choice of law analysis that the court would have applied. *See, e.g., Volvo Grp. N. Am. LLC v. Forja de Monterrey SA de CV* No 16-cv-114 (M.D.N.C. Mar 31, 2018) (citing *Klaxon Co, v. Stentor Elec. Manufacturing Co*, 313 U.S. 487, 496 (1941)(holding that a federal court sitting in diversity jurisdiction must apply the choice of law analysis of the state in which

6

it sits). The question here is not an all or nothing choice of law analysis one way or the other based on contractual interpretation—indeed, this is not a breach of contract action. The question instead is what law specifically applies to Respondent's tortious conduct that occurs *within* the State of North Carolina. The answer to that question is significantly different than the result that would be reached if there was some ambiguity in the contract. As will be shown herein, a North Carolina court would apply North Carolina laws to Claimant's tort claims. Respectfully, the Arbitrator should do the same.

## A. Claimant Has Brought North Carolina Statutory Claims.

Claimant's claims for relief arise from Respondent's violations of North Carolina statutory law. Claimant has not brought claims for breaches of the subject loan agreements. North Carolina courts have treated claims for statutory violations (such as the Chapter 24, 53 and 75 violations asserted here) similar to a tort claim with regard to choice of law. The primary inquiry is where the harm sought to be prevented occurred. The North Carolina courts have held: "[w]e are satisfied that North Carolina's courts would apply N.C. Gen. Stat. 75-1.1 [North Carolina Unfair Trade Practice Act] to the facts presented here without regard to the presence of the contractual choice of law provision. The nature of the liability allegedly to be imposed by the statute is ex delicto, not ex contractu... ." *United Virginia Bank v. Air-Lift Associates, Inc.*, 339 S.E.2d 90, 93, 79 N.C.App. 315, 321 (1986). The Federal District Court in *Sasser v. Safe Home Sec., Inc.*, No. 1:18-cv-746 (M.D.N.C., Aug. 15, 2019)(Exhibit 8) thoroughly analyzed the issues as follows:

North Carolina law will also be applied to Sasser's unfair and deceptive trade

7

practices claim. While the North Carolina Supreme Court has not addressed the choice of law rules applicable to an unfair and deceptive trade practices claim, the North Carolina Court of Appeals, in cases from the 1980's, has used both the most significant relationship test and the lex loci rule. In the time since, federal courts, including this Court, have considered the issue and concluded the lex loci rule applies to North Carolina unfair and deceptive trade practices claims. Therefore, North Carolina law shall be applied to Sasser's unfair and deceptive trade practices claim because, as above, North Carolina is the only state where Mr. Richards was plausibly alleged to have been injured.

*Id.* at 5-6 (internal quotations and citations omitted).

The lex loci test dictates that the law of the State where the last act occurred giving rise to an injury is the applicable law. The last act giving rise to a claim of unfair and deceptive trade practices is the suffering of damages. *P&L Dev., LLC v. Bionpharma*, Inc., 367 F.Supp.3d 421, 428-29 (M.D. N.C. 2019). When a plaintiff suffers "commercial or financial injury, rather than physical injury, courts often look at the location where the economic loss was felt." *Id.* at 429. Here, the damages were felt in North Carolina because Claimant is a resident of North Carolina, Claimant made usurious interest payments from North Carolina and Respondent seized Claimant's car in North Carolina. Claimant felt the financial losses created by Respondent's collection of usurious interest and seizure of his car in North Carolina. This choice of law for claims based on Chapter 75 should apply equally to statutory claims based on Chapter 24 and Chapter 53. All claims involve statutory violations, the damages for which were felt in North Carolina.

**B.      Respondent Has Not Established That All Contractual Activities Related To The Loan It Made To Claimant Took Place Outside Of North Carolina.**

8

The North Carolina Consumer Finance Act at N.C.G.S. § 53-190(a) is perfectly clear. When an out-of-state lender makes a loan in the amount of $15,000 or less and charges an annual rate of interest that exceeds the rates allowed under North Carolina law, the loan is presumptively invalid unless the party seeking to enforce the loan – here Respondent – establishes that all contractual activities including, among other things, solicitation, discussion, negotiation, offer and acceptance, occur entirely outside of North Carolina. Respondent cannot carry that burden because the record evidence establishes that:

1. Respondent discussed the details of the car title loan with Claimant over the telephone at a time when he was physically present in North Carolina.

2. Respondent offered Claimant the car title loan over the telephone at a time when he was physically present in North Carolina.

3. Respondent received Claimant's acceptance of its loan offers over the telephone at a time when he was physically present in North Carolina.

4. Respondent accepted loan payments from North Carolina by debit card and money orders.

(Affidavit of Stanley Ewings, Exhibit 5). Claimant has clearly established that Respondent engaged in numerous in-state activities that both void the subject loan and create liabilities owing to Claimant pursuant to the North Carolina Consumer Finance Act at N.C.G.S. § 53-190(a). Finally, and also as part of the loan process for the loan, Respondent used the North Carolina DMV to perfect its claimed security interests.

9

Respondent cannot seriously contend that using the North Carolina DMV as part of the loan creation process is not a "contractual activity" within the meaning of N.C.G.S. § 53-190(a).

Moreover, the Act at N.C.G.S. § 53-190(b) applies to these loans because Respondent routinely "comes into this State to solicit or otherwise conduct activities" in connection with its car title lending business. The record evidence establishes that:

1. Respondent and its affiliates regularly solicit, discuss, make loan offers and receive acceptances of those offers from North Carolina residents. Declaration of Respondent's former employee Darren Medley, Exhibit 6 at ¶ 7) (Affidavit of Respondent's former employee Jessica Crowley, Exhibit 7).

2. Respondent offers to pay and does pay referral fees to North Carolina residents. (Exhibit 9 – Affidavit of Jennifer Snipes, ¶16)

3. Respondent routinely solicits, discusses, offers and receives acceptances for its illegal loans in North Carolina (Exhibit 10 - Affidavits of Tyrone Mance, Lorraine White, Kelvin Smith, John Johnson, Melissah Scales, Tamara Davis, Deveda Hines, Howard Welch, Kimberly Morrow and Dominick Hinson)(Exhibit 9 – Affidavit of Jennifer Snipes) Indeed, Respondent's former employee Darren Medley has declared that

10

Respondent makes "significantly more loans to North Carolina residents than Virginia residents" at its store in South Boston, Virginia. (Exhibit 6 at ¶ 8)

4. Respondent, pursuant to its marketing program, sends text messages into North Carolina. (Exhibit 9 – Affidavit of Jennifer Snipes)

5. Respondent uses and has used the North Carolina DMV to perfect security interests in motor vehicles owned by thousands of North Carolina residents. (Exhibit 11 - DMV Report dated February 13, 2019)(Exhibit 10 - Affidavits of Tyrone Mance, Lorraine White, Kelvin Smith, John Johnson, Melissah Scales, Tamara Davis, Deveda Hines, Howard Welch, Kimberly Morrow and Dominick Hinson) )(Exhibit 9 – Affidavit of Jennifer Snipes)

6. Respondent routinely accepts loan payments from North Carolina. (Exhibit 10 – Affidavits of Tyrone Mance, Lorraine White, Kelvin Smith, Melissah Scales, Tamara Davis, Deveda Hines, Howard Welch, Kimberly Morrow and Dominick Hinson) (Exhibit 9 – Affidavit of Jennifer Snipes)(Exhibit 5 – Affidavit of Stanley Ewings)

7. Respondent routinely re-enters North Carolina to take possession

11

of collateral motor vehicles. (Exhibit 10 – Affidavits of Tyrone Mance, Lorraine White, Kelvin Smith, John Johnson, Melissah Scales, Tamara Davis, Deveda Hines, Howard Welch, Kimberly Morrow and Dominick Hinson) (Exhibit 9 – Affidavit of Jennifer Snipes) (Exhibit 5 – Affidavit of Stanley Ewings and repossession attachments)

The remedy for a violation of the Act is set forth in N.C.G.S. § 53-166(d) which makes available both compensatory and declaratory relief and states that loans that violate the Act "shall be void and the licensee or any other party in violation shall have no right to collect, receive or retain any principal whatsoever with respect to such loan." Accordingly, Claimant seeks compensatory damages for his principal, interest and fee payments in the amount of $5083.66 as shown by Exhibit 12 (Claimant's payment histories that have been produced by Respondent)

### C.  North Carolina General Statute § 75-1.1.

Claimant also asks the Arbitrator to award treble damages pursuant to the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §75.1.1 *et seq.*, in connection with Claimant's claim for damages under the North Carolina Consumer Finance Act. The fundamental purpose of Chapter 75 is to protect North Carolina consumers. The Courts look to that purpose in deciding whether Chapter 75 applies to any given factual situation. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (1999) A business practice is actionable under Chapter 75 when it can be considered unethical, unscrupulous or

12

deceptive. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (1987).

A violation of Chapter 53 is a *per se* violation of Chapter 75. *State of NC v. NCCS Loans*, 624 S.E.2d 371, 378, 174 N.C. App. 630 (2005) squarely addresses this issue. There, the Court held:

> Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive practices." *Stanley v. Moore*, 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995). In this regard, we note that it is a "paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1 (2003). Defendants' practice of offering usurious loans was a clear violation of this policy. We conclude that the trial court did not err by ruling as a matter of law that this constitutes unfair or deceptive trade practices, in violation of N.C. Gen. Stat. § 75-1.1 (2003).

Additionally, *Odell v. Legal Bucks*, LLC, 665 S.E.2d 767 (N.C. App., 2008) is analogous to the matter before the Arbitrator. The *Odell* Court held:

> Although Defendants disclosed the terms of the advance to Plaintiff, Defendants did not inform Plaintiff that she was executing a contract that violated the Consumer Finance Act. Therefore, Defendants' conduct "had the capacity to deceive," as Defendants did not disclose the actual nature of the transaction to Plaintiff. Further, Defendants' contract with Plaintiff for an illegal advance violated "the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1(g) (2007). On these facts, we hold that Defendants committed unfair and deceptive trade practices as a matter of law.

As establish, *supra, at* no time did Claimant know that the loan contracts Claimant entered into with Respondent were unlawful and Respondent surely did not inform Claimant of this fact.

Plainly, Respondent's conduct in making Claimant a loan with an annual rates of interest of 155.90%, 155.6912% and 180.2675% in violation of the Consumer Finance Act

13

and in not disclosing to him the illegality of the loan offends the sound public policy of North Carolina and is an unfair, unethical and unscrupulous business practice within the meaning of Chapter 75. Further, as will be shown in Section IV, TitleMax violated the criminal statutes in notarizing the document and using that notarization to convert an automobile after entering into North Carolina. There is scarcely a fact pattern that could justify a Chapter 75 interstate commerce unfair and deceptive trade practice more than that. Accordingly, Claimant seeks the treble damages in the amount of $15,250.98.

>    **D.**    **North Carolina General Statutes Chapter 24**.

Alternatively, Claimant brings a claim against Respondent for its violation of the North Carolina usury statutes, N.C.G.S. §24-1.1, *et seq*. N.C. Gen. Stat. § 24-2.1, in pertinent part, provides:

> Transactions governed by Chapter.
>
> (a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.
>
> (b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.
>
> (c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

Claimant's Affidavit and the Declaration of Respondent's former employee Darren

Medley establish that Respondent solicited him for the loan, discussed the loan with him, offered the loan to him and received his acceptance for the loan all at a time when he was physically present in the state of North Carolina. Therefore, North Carolina interest laws clearly apply and the maximum annual rate of interest Respondent could have permissibly charged Respondent under N.C.G.S. § 24-1.1 was 16%.

The penalty for usury is contained in N.C.G.S. § 24-2 and states "in case a greater rate of interest has been paid, the person . . . by whom it has been paid may recover back twice the amount of interest paid . . . ." Accordingly, Claimant seeks compensatory damages for his interest payments in the amount of $5949.26 as shown by Exhibit 12 (Claimant's payment histories).

## II. <u>Respondent's Choice Of Law Provision Does Not Prevent The Application Of North Carolina Law To Respondent's Tortious Activities In North Carolina.</u>

The centerpiece of Respondent's defense is an argument that a choice of law provision it included in its loan agreement allows Respondent to contract its way out of compliance with North Carolina law even when it engages in the in-state conduct established herein.

### A. Because Of Respondent's Conduct The Loan, By Law, Is Deemed To Have Been Made in North Carolina.

Chapter 24 of the North Carolina General Statutes governs lawful interest rates in North Carolina. The Chapter describes the transactions it governs at N.C. Gen. Stat. § 24-2.1:

Transactions governed by Chapter.

15

(a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.

(b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.

(c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

(d) Any oral or written offer, acceptance, solicitation or communication to lend or borrow, made in this State to, or received in this State from, a borrower who is not a resident of this State shall be subject to the provisions of this Chapter, applicable federal law, law of the situs of the contract, or law of the residence of any such borrower as the parties may elect.

(e) Any person who acquires a right by contract or by assignment to receive payments under a loan made in this State to an individual or individuals who is a resident of this State at the time of the loan and who benefits from the laws of this State by having the loan secured by real property located in this State is deemed to have consented to the courts of this State having jurisdiction over such person for any claim under this Chapter and for any claim related to the loan instrument.

(f) The provisions of this section shall be severable and if any phrase, clause, sentence or provision is declared to be invalid, the validity of the remainder of this section shall not be affected thereby.

(g) It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws. Any provision of this section which acts to interfere in the attainment of that public policy shall be of no effect. (1979, c. 706, s. 3; 1983, c. 126, s. 11; 2007-351, s. 3.)

After hearing Respondent's radio advertisement, Claimant contacted Respondent from North Carolina to inquire about a loan. Respondent asked Claimant to provide loan

Case 1:19-cv-00489-LCB-JLW   Document 109-1   Filed 01/12/21   Page 16 of 30

qualifying information, which Claimant provided. Respondent asked Claimant for information regarding Claimant's motor vehicle, which was also provided. Respondent asked if Claimant wanted the loan and after Claimant responded affirmatively Respondent instructed Claimant to drive to Respondent's office in South Boston, Virginia. (Exhibit 5 – Affidavit of Stanley Ewings) These discussions, without question, were a "solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State" and are subject to North Carolina law pursuant to N.C. Gen. Stat. § 24-2.1(b). Comparing Respondent's actions to the provisions of Section 24-2.1, Respondent's loan, by law, is deemed to have been made in North Carolina and is therefore subject to North Carolina lending laws.

**B.      North Carolina Law Applies To Respondent's Activities in North Carolina.**

The North Carolina Business Court in *State v. Western Sky Fin., LLC*, 2015 NCBC 84 (2015)(Exhibit 2), another predatory lending case, observed that "[t]he North Carolina Supreme Court has held that a contract made in a foreign state or country with the intent and propose to avoid the usury laws of this State is invalid and the interest laws of North Carolina are applicable." *Id.* at ¶37 (quoting *Bundy v. Comm. Credit Co.*, 200 N.C. 511, 517-18 (1931)). The Business Court further recognized that North Carolina courts do not enforce choice of law provisions where the chosen law "would violate a fundamental policy of [North Carolina] of otherwise applicable law." *Id.* at ¶39. (citing *Behr v. Behr,* 46 N.C. App. 694, 696 (1980)). With this well-settled principle of law in mind, the Business Court held that "[t]he North Carolina usury statute makes clear that '[i]t is the paramount public

17

policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.' " *Id.* By charging Claimant, a North Carolina resident, an annual rate of interest of connection with the car title loan at issue Respondent clearly has violated the sound public policy of North Carolina. The Arbitrator should follow the lead of the North Carolina Business Court in *Western Sky.*

Furthermore, there is ample record evidence to support a finding that Respondent, with intent and purpose, attempts to avoid the usury laws of North Carolina. The record evidence establishes that Respondent actively works to obtain North Carolina resident borrowers. (*See, e.g.,* Crowley Affidavit, Exhibit 7 and Medley Declaration, Exhibit 6) Respondent's considerable efforts to secure North Carolina resident borrowers beg a significant question: Why doesn't Respondent simply establish business locations in North Carolina to make it more convenient for North Carolinians to transact business with Respondent which, in all probability, would increase Respondent's volume of North Carolina loans? While Respondent certainly could set up shop in North Carolina, it chooses instead to solicit and qualify prospective North Carolina borrowers over the telephone, discuss the details of its loan products with those prospective borrowers, and offer its loans to those prospective borrowers all at a time when those persons are physically present in the state of North Carolina. The record evidence without question proves Respondent has structured its operations, at least as they concern North Carolina residents, in a manner designed to avoid North Carolina interest laws.

> **C.  North Carolina Law Alternatively Applies Because The Subject Loan Was Secured By Claimant's North Carolina Motor Vehicle.**

Case 1:19-cv-00489-LCB-JLW   Document 109-1   Filed 01/12/21   Page 18 of 30

A loan made to a North Carolina resident which is secured by realty or personalty that is located in North Carolina is subject to North Carolina law. *Equilease Corp. v. Belk Hotel Corp.*, 256 S.E.2d 836, 42 N.C. App. 436, *pet. disc. rev. denied*, 261 S.E.2d 121, 298 N.C. 568 (1979). In *Equilese*, a lender filed suit against a borrower after the borrower defaulted on a loan secured by two elevators that were located in a building in North Carolina. The defendant borrower claimed the interest rate in the loan agreement was usurious. *Id.* at 837. The court, upon surveying North Carolina case law, noted that "without qualification" a loan secured by real estate located in North Carolina is subject to North Carolina interest and usury laws. *Id.* at 837-38. The *Equilese* court went on to hold that that rule applies equally to transactions which are secured by North Carolina personalty, as is plainly the case with the car title loan transactions at issue here. *Id.* at 839. The *Equilease* Court stated:

> We have been presented with no authority or reasoning to compel us to reach the conclusion that the choice of the applicable usury law must depend upon whether the two Otis elevators securing plaintiff's loan are characterized as realty or personalty. If indeed North Carolina's policy is to subject foreign lenders to our usury laws in exchange for their use of North Carolina property as security, as it apparently is, then the Meroney Rule must apply with equal force to loans secured by North Carolina realty and personalty. Indeed, according to the Uniform Commercial Code, G.S. 25-9-102(1), North Carolina law governs the effect of a security instrument in personal property and fixtures just as it governs the effect of deeds of trust on interests in real property.

*Id.* The loans at issue were secured by Claimant's motor vehicles which were titled and located in North Carolina. Therefore, and pursuant to the holding in *Equilese*, North Carolina laws (the Consumer Finance Act, Chapter 75 and Chapter 24) apply to these loans.

19

### III. The Dormant Commerce Clause Does Not Bar Claimant's Claims Against Respondent.

Respondent also argues that the North Carolina Consumer Finance Act violates the dormant Commerce Clause and asks the Arbitrator to so find. Respectfully, the Arbitrator should apply the law as he finds it. Actively changing current law or declaring statutes unconstitutional is not in the province of an arbitrator. *Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037, 1052 (1984)(Posner, J., dissenting on other grounds)(Arbitrators' "decisions carry no official imprimatur. They never hold statutes unconstitutional.") Unless and until a court of competent jurisdiction declares the North Carolina Consumer Finance Act unconstitutional the Act is good law that controls Claimant's claims.

### A. N.C.G.S. §53-190 Does Not Implicate The Dormant Commerce Clause.

By its terms, N.C.G.S. §53-190(b) limits the reach of that statute only to those lenders who engage in lending and lending-related activities within the borders of the State of North Carolina. The statute reads: "If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, *comes in to this State* to solicit or otherwise conduct activities in regard to such loan contracts then such lender shall be subject to the requirements of this Article." N.C.G.S. §53-190(b)(2015)(emphasis added). In enacting this law, the North Carolina legislature in no way sought to, or attempted to, regulate the commercial activities of lenders in states other than North Carolina. Rather, the legislature exercised its lawful authority to pass a law that governs conduct that occurs in North Carolina. As such, the statute does not trigger any dormant Commerce Clause concerns whatsover.

20

N.C.G.S. §53-190(a) is likewise appropriately circumscribed. In pertinent part, that statute expressly exempts from its grasp those lenders whose loan contracting activities (i.e., solicitation, discussion, negotiation, offer and acceptance, etc.) occur entirely outside of the State of North Carolina. Plainly, the legislature was mindful of the constitutional limitations on its law-making authority when it carefully crafted N.C.G.S. §53-190.

Respondent, however, systematically and by design enters into North Carolina, both actually and virtually, in furtherance of its lending business that violates the usury laws of this state. Respondent's former employee Darren Medley and Jessica Crowley have testified that Respondent solicits North Carolina residents for its loan products when those residents are physically present in the state. (Exhibit 6 and Exhibit 10) Respondent discusses, negotiates, offers and receives acceptances for its loan products at times when its customers are physically within the borders of North Carolina. Respondent accepts payments from North Carolina. And, most significantly, Respondent has registered with the state as a motor vehicle lienor and it uses North Carolina state law and the North Carolina Department of Motor Vehicles to perfect and enforce its security interests in North Carolina titled and registered motor vehicles, which vehicles Respondent later repossesses from North Carolina. In other words, Respondent avails itself of the benefits and protections of the laws of North Carolina when and where Respondent profits from those laws, yet Respondent claims immunity from North Carolina law here.

### B. N.C.G.S. §53-190 Survives A Dormant Commerce Clause Analysis.

Case 1:19-cv-00489-LCB-JLW   Document 109-1   Filed 01/12/21   Page 21 of 30

In the event the application of N.C.G.S. §53-190 to Defendant's in-state lending activities somehow impacts Defendant's conduct outside of North Carolina, that impact is evenhanded, at most indirect, in furtherance of a legitimate state interest and thusly constitutionally permissible.

The constitutional grant of authority to Congress to regulate interstate commerce is understood to provide "protection from state legislation inimical to the national commerce even where Congress has not acted." *Barclays Bank, PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 114 S. Ct. 2268, 129 L. Ed. 2d 244 (1994). This negative command, known as the dormant Commerce Clause, prohibits States from legislating in ways that impede the flow of interstate commerce. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.* 514 U.S. 175, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995). This "principle against extraterritoriality" is born of the notion that "a State may not regulate commerce occurring wholly outside of its borders." *Healy v. Beer Inst.*, 491 U.S. 324, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)(emphasis added). However, the limitation the dormant Commerce Clause places upon State power is by no means absolute. "In the absence of conflicting federal legislation the States retain authority under their general police powers to regulate matters of legitimate local concern even though interstate commerce may be affected." *Lewis v. BT Investment Mgrs., Inc.*, 447 U.S. 27, 100 S. Ct. 2009, 64 L. Ed. 2d 702 (1980).

In determining whether a state statute violates the dormant Commerce Clause, the courts conduct a two-tiered analysis. *Environmental Technology Council v. Sierra Club*, 98 F.3d 774 (4th Cir. 1996). When a state statute directly regulates or discriminates against interstate commerce, or when the effect is to favor in-state economic interests over out-of-

22

state interests, the statute is generally struck down without further inquiry. *Brown-Foreman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L. Ed. 2d 552 (1986.) Defendant cannot claim that N.C.G.S. §53-190 directly regulates the interest rates it may charge in states other than North Carolina. The statute does not dictate what interest rates Defendant may charge its borrowers in other states nor does it require Defendant to lend in other states at the rates of interest required by North Carolina law. Rather, N.C.G.S. §53-190 governs Defendant's loans *only* when Defendant chooses to enter into the State of North Carolina for the purpose of engaging in conduct and activities that further its lending business. Furthermore, N.C.G.S. §53-190 does not discriminate in favor of North Carolina car title loan lenders and against Defendant. Domestic lenders are not permitted to charge higher rates of interest than Defendant.

When a statute does not discriminate against interstate commerce, as is the case here, but rather regulates evenhandedly and only indirectly affects interstate commerce, the courts conduct a balancing test to determine whether the state's interest in enacting the challenged legislation is legitimate and whether the burden on interstate commerce clearly exceeds the putative local benefits.[3] *Brown-Foreman*, 476 U.S. at 579. Respondent surely cannot argue that North Carolina does not have a legitimate interest in protecting its citizens from predatory lending practices. It is the well-settled law of this state that the North Carolina usury and unfair trade practices statutes were enacted to protect North

---

[3] It is highly unlikely that N.C.G.S. §53-190 in any manner adversely affects Respondent's lending business in any states other than North Carolina and, to the extent such affects have occurred, there is zero record evidence of the volume and scope of those affects such that the Arbitrator may do a meaningful balancing test.

Case 1:19-cv-00489-LCB-JLW   Document 109-1   Filed 01/12/21   Page 23 of 30

Carolina consumers, a purpose that is "squarely within this State's ability to shelter its people … from fraud*.*" *See Western Sky*. In *Western Sky*, the North Carolina Business Court, citing *Aldens, Inc. v. Packel*, 524 F.2d 38 (3rd Cir. 1975) observed that "Congress has deferred to the states on the matter of maximum interest rates in consumer credit transactions." The Business Court further observed that "courts throughout the United States have consistently allowed states to regulate the content of loan contracts made by out-of-state lenders to resident borrowers." *Western Sky,* citing *State of Minn. V. CashCall, Inc.*, No. 27-CV-12740 (Minn. Dist. Ct. Sept 6, 2013)).

The Business Court in *Western Sky* rejected a defense challenge that the North Carolina Usury Statute, N.C.G.S. §24-1.1, and the North Carolina Consumer Finance Act, N.C.G.S. §53-164, *et seq.*, violated the dormant Commerce Clause as those statutes were being applied to the conduct of the predatory lender that was the target of state enforcement action in that case. In rejecting that challenge the Business Court held that "[t]he statutes at issue do not attempt to regulate conduct beyond North Carolina's borders and do not unduly burden interstate commerce." The Court further observed that "[t]he statutes do not purport to dictate the interest rates or other lending practices that Defendants apply in any state other than North Carolina." The Court concluded, after engaging in a balancing analysis pursuant to *Brown-Foreman*, that "the State's application of the relevant statutes to the loans at issue does not violate the dormant Commerce Clause." It is inarguable that the longstanding and well-settled right of the State of North Carolina to protect its citizens from predatory lending practices far outweighs whatever incidental impacts its laws may have on interstate commerce.

Respondent relies heavily on a Seventh Circuit opinion—*Midwest Title Loans v. Mills*— for its argument that the applicable North Carolina laws are unconstitutional. This argument fails for several reasons. First, *Midwest Title Loans* is distinguishable on its facts. *Midwest Title Loans* addresses the authority of the State of Indiana to force a title lender to register to conduct business in Indiana. It does not address, and expressly distinguishes, the question of whether Indiana law would apply to a consumer loan transaction with a Hoosier in an Indiana Court. The Court observed:

> Midwest has yet to sue any of its title borrowers. But if there were a suit, an Indiana court might rule that Indiana had the "most intimate contacts" with the transaction and therefore that its law applied even though the loan had been made in Illinois. Or it might rule that Illinois's failure to limit the interest rates in title loans was so offensive to the public policy of Indiana that the Illinois law would not be enforced in Indiana – in which event the Indiana courts might refuse to apply Illinois law even if Midwest's contracts contained a choice of law clause directing that Illinois govern a suit arising from the contract – which they do. In short, a particular set of facts giving rise to litigation [can] justify, constitutionally [that is, under the due process clause] the application of more than one jurisdiction's laws.

*Id.* at 668 (internal citations omitted) And, again, the North Carolina Business Court expressly addressed this issue in its post-*Midwest Title Loans* decision and rejected the argument that Respondent now makes. The North Carolina Business Court opinion is much more persuasive, because it: (a) addresses the factual and legal issues here - whether North Carolina law may permissibly apply to consumer loans with North Carolina residents when contractual activities take place in North Carolina; and (b) deals directly with the North Carolina consumer protection statutes at issue here, rather than an Indiana registration requirement.

## IV.    **Respondent Has Violated Virginia Notary Law**.

Unlike the Virginia DMV, the North Carolina DMV requires notarization of car title lien applications.    Claimant will testify that at the time he signed the NCDMV lien application  he was not asked by a notary public for verification of his identity,  his signature was not made before a notary public,  at no time was he asked to acknowledge his signature before a notary public and a notary public did not affix his or her seal on the lien application in his presence.  Respondent's employees (or some other person) notarized Claimant's lien application at some point in time after Claimant had left Respondent's store and, as such, Respondent violated Virginia law.

The Virginia Handbook for Notaries Public (Exhibit 13) states:

> Before performing a notarial act, a notary must be CERTAIN of the identity of each person whose signature will be notarized. A notary is required to exercise a HIGH DEGREE OF CARE in determining the identity of any person whose identity is the subject of a notarial act. Unless such person is known by the notary, identity shall be ascertained by examination of one or more of the following nine unexpired documents: 1) a United States Passport, 2) a United States Passport Card, 3) a certificate of United States citizenship, 4) a certificate of naturalization, 5) a foreign passport, 6) an alien registration card with photograph, 7) a state issued driver's license, 8) state-issued identification card, or 9) a United States military card. A notary must never accept any signature as genuine on the word of a third party. An acknowledgment must be made by the person whose signature is the subject of the acknowledgment. Oaths must be administered by a notary for any sworn document and the person giving the oath must appear, in person, before the notary who administers the oath. A notary who fails to establish the identity of a person runs the risk of being sued for negligence or malfeasance in office.

Violations of Virginia notary laws create civil liabilities for both the notary and his or her employer and are criminal acts.  (Exhibit 13, p. 3). Moreover, the testimony of

Case 1:19-cv-00489-LCB-JLW   Document 109-1   Filed 01/12/21   Page 26 of 30

Respondents' related company's former employee Jessica Crowley establishes that Respondent's conduct with regard to the notarization of Claimant's North Carolina lien application is part of a pattern and regular practice of Respondent intentionally violating state notary laws. *See* Affidavit of Jessica Crowley, Exhibit 7, ¶ 3 ("I resigned from TitleMax in November 2019 because I disagreed with actions that my supervisors asked me to take, including notarization if documents that were signed outside of my presence, at other TitleMax locations.") And, on October 13, 2020, Respondent's General Manager Laura Barbour stated in her deposition that her store in Martinsville, Virginia, routinely allows North Carolina lien applications to accumulate and are notarized the next day by a person who typically had no dealings with the persons who had signed the lien application.

Respondent submitted the invalid lien application to NCDMV to obtain a lien on Claimant's motor vehicle and later used that fraudulently obtained lien to seize Claimant's car in North Carolina. Such conduct is a clear unfair and deceptive trade practice within the meaning of N.C.G.S. §75.1.1 *et seq.* and another example of Respondent's disrespect for and intent to avoid laws that govern its business.

### V.    <u>None of Claimant's Claims Are Time-Barred.</u>

The "continuing wrong" exception to the statute of limitations brings all of Respondent's conduct within the proper statutory period. *See Petruzzo v. Healthextras, Inc.*, 124 F.Supp.3d 642 (E.D.N.C. 2015) (denying a statute of limitations defense where "(t)he continuing wrong doctrine provides an exception to accruing the claims in this case, where defendants continued to collect premiums."); *See also Williams v. Blue Cross Blue Shield*, 581 S.E.2d 415, 423 (2003) and *Thomas v. Petro-Wash, Inc.*, 429 F. Supp. 808, 812

27

(M.D.N.C. 1977)(holding that defendant's continued sales of gasoline to plaintiff after entering into an agreement which violated state and federal antitrust laws constituted continuing overt acts for purposes of the statute of limitations and, therefore, the action was not time-barred.) Further, and conclusive of this issue, N.C.G.S. §53-166(d) makes "<u>retaining</u> any principal or charges" a separate offense. Therefore, Respondent's retention of all of Claimant's payments and charges remains ongoing. Finally, pursuant to N.C.G.S. §75-16.2, the statute of limitations for Claimant's unfair and deceptive trade practice claims is four years. Claimant filed the state court action that initiated this arbitration proceeding on April 4, 2019 well within the four year statute of limitations period for the oldest loan at issue (the loan that originated on November 11, 2015).

## CONCLUSION

For the reasons stated herein, Claimant respectfully asks the Arbitrator to make the following Awards:

1. That Claimant have and recover of Respondent the amount of $5083.66 for claims pursuant to the North Carolina Consumer Finance Act, with said amount then trebled to $15,250.98 for Claimant's claim pursuant to the North Carolina Unfair and Deceptive Trade Practices Act;

2. That Claimant have and recover reasonable attorneys' fees pursuant to N.C.G.S. §75.-16.1;

3. Alternatively, that Claimant have and recover of Respondent the amount of $5949.26 for claims pursuant to the North Carolina usury statutes, N.C.G.S. §24-1.1, *et seq.*;

28

4. That the Arbitrator declare the Loan Agreement to be void and unenforceable.


Respectfully submitted, this 15th day of October, 2020.


Drew Brown
Attorney for Claimant


FOR THE FIRM:

**BROWN, FAUCHER, PERALDO & BENSON, PLLC**
822 North Elm Street, Suite 200
Greensboro, NC 27401
(336) 478-6000 (telephone)
(336) 273-5597 (facsimile)
drew@greensborolawcenter.com

Case 1:19-cv-00489-LCB-JLW   Document 109-1   Filed 01/12/21   Page 29 of 30

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served a copy of the foregoing document and exhibits in the above-entitled action upon all other parties to this cause by email addressed to the parties as follows:

Jason D. Evans
Troutman Sanders LLP
301 South College St.
Suite 3400
Charlotte, NC 28202
Jason.Evans@troutman.com

This the 15th day of October, 2020.

_____
Drew Brown
Attorney for Claimant

FOR THE FIRM:

**BROWN, FAUCHER, PERALDO & BENSON, PLLC**
822 North Elm Street
Greensboro, NC 27401
(336) 478-6000 (telephone)
(336) 273-5597 (facsimile)
drew@greensborolawcenter.com