AMERICAN ARBITRATION ASSOCIATION
Case No. 01-19-0001-4344

| | |
|---|---|
| Dominick Hinson,<br><br>Claimant,<br><br>v.<br><br>TitleMax of Virginia, Inc.<br><br>Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**CLAIMANT'S ARBITRATION<br>SUBMISSION**

NOW COMES Claimant Dominick Hinson, through counsel, and respectfully submits this Brief and accompanying Exhibits in support of claims in this arbitration proceeding.

TitleMax frames this case as Claimant attempting to change the applicable law after the fact. It is not so. N.C. Gen. Stats. § 53-190 and § 24-2.1 (both of which have been the law in North Carolina for decades) applied to the transaction all along. The relationship between Claimant and TitleMax originated with a phone call by Claimant in North Carolina to TitleMax in Virginia. TitleMax does not dispute this. Claimant and TitleMax engaged in a <u>discussion</u> during that phone call which included TitleMax directing Claimant to bring his car and title to Virginia to complete a loan with the discussion of a likely loan resulting in the drive. The die was cast. TitleMax cannot undo the discussion with a North Carolina borrower in North Carolina by mandating a choice of law provision after the fact or requiring that the North Carolina borrower travel out of state to complete the loan. TitleMax cites no authority which would permit it to contract around North Carolina law in this fashion. It would be an absurd result indeed if a predatory lender could get around a "loans made elsewhere" provision (that's the actual statute

1

title) by insisting that a North Carolina borrower—with whom it has already dealt in North Carolina—travel elsewhere to complete the loan.

## RELEVANT FACTS

The first contact between Claimant and Respondent was a phone call. Claimant testified that he called from North Carolina and TitleMax presented no evidence to the contrary. TileMax's deponent Ms. Garner was candid that she was not present, and has not even discussed Claimant and TitleMax communications with Claimant, or with anyone—including at TitleMax. She has been to the Martinsville store at most three times in years. TitleMax chose not to put on their own witnesses to Mr. Hinson's loan—because they know they cannot contradict his testimony. During the call, TitleMax told Claimant that if he brough his vehicle and clean title to the Martinsville store he would almost certainly get a loan. A ballpark loan amount was discussed over the phone, but TitleMax contends that nothing was promised or guaranteed—nor did it need to be under the North Carolina Consumer Finance Act. Claimant then traveled to Virginia as instructed by TitleMax. Further, it is undisputed that TitleMax perfected its security interest using the North Carolina DMV by sending the lien recording application to North Carolina. TitleMax then made collection efforts, including calls into North Carolina and received funds from a Western Union in North Carolina. TitleMax subsequently came into North Carolina, through its agent, to take the car.

## I.     TitleMax is Subject to the North Carolina Consumer Finance Act Pursuant to N.C. Gen. Stat. § 53-190(a).

This matter is pending in the Middle District of North Carolina and Respondent conceded correctly at the hearing that the arbitrator should sit as if he were the Judge in the Middle District of North Carolina. Indeed, that Court has ordered this case to be heard at this arbitration as exactly as if that Court was applying North Carolina law. The North Carolina Consumer Finance Act

Case 1:19-cv-00489-LCB-JLW   Document 116-1   Filed 02/01/21   Page 2 of 38

without question applies to the conduct and activities of Respondent with regard to the car title loan at issue. The North Carolina Legislature expressly chose to make the Act apply to situations like the one before the Arbitrator. The Act, at N.C.G.S. § 53-190(a)( "Loans Made Elsewhere') provides: "[n]o loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State." The highest rate of interest permitted by N.C.G.S. § 53-176 (a) is 30% per annum on loans in the principal amount of $4000.00 and less.

Unless all "contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds" occurred entirely outside North Carolina, TitleMax is subject to the North Carolina Consumer Finance Act. N.C.G.S. 53-190. TitleMax cannot meet this strict test. Claimant and TitleMax discussed and negotiated the loan when Claimant was in North Carolina and TitleMax perfected its lien on Claimant's vehicle in North Carolina. Discussion must be different than negotiation and offer which must be different than signing of documents because they are all listed separately in the statute. Likewise delivery must be different than receipt of funds. Indeed, the new statute draws these distinctions and says that each event must occur entirely outside of North Carolina or the Act applies. TitleMax does not like the statute but it should not be openly violating it by setting up along the border to choose to do business with and then prey on North Carolinians. To be clear, it continues to do so despite Judges and Arbitrators finding its conduct to be an Unfair & Deceptive Trade Practice. TitleMax is simply making too much money to stop.

TitleMax contends that two people talking to each other on the phone is not a discussion— because it must take such an extreme position to prevail. When the language of a statute is clear

3

and unambiguous, the court must apply the plain meaning of the words. *Fid. Bank v. N.C. Dep't of Revenue*, 803 S.E.2d 142, 148 (N.C. 2017) "Discussion" is "the act of talking about something with other people and telling them your ideas or opinions."[1] Claimant indeed called TitleMax from North Carolina and asked about a loan. The statute does not say this is ok if Claimant calls. Instead it specifically says <u>no discussion at all, entirely</u> is ok or the Consumer Finance Act applies even though there is a "Loan Made Elsewhere." At best for TitleMax, Claimant and TitleMax talked about the potential amount of a loan and instructions were "discussed" as to how to make it happen. At worst for TitleMax, a ball park loan number was discussed and a payment timeline and interest were negotiated. TitleMax told him where to come and what to bring—even Ms. Garner says this is what always occurs when a North Carolina customer calls. By any reasonable interpretation that is discussion, and probably also negotiation. TitleMax claims that "loan specifics" were only discussed after Claimant drove to Virginia. However, there is no indication that legislatures use of "discussion" was intended to be limited to "loan specifics".

In addition to discussion—and though not necessary for the Claimant to prevail--the parties negotiated while on the phone. "Negotiation has been defined as deliberation, discussion, or conference upon the terms of a proposed agreement, or as the act of settling or arranging the terms of a bargain or sale." *Cooper v. Henderson*, 284 S.E.2d 756, 55 N.C.App. 234 (N.C. App. 1981). It is not necessary that all of the terms of the proposed agreement be discussed or that a deal be reached. Whether an agreement was reached or not, discussion about proposed terms constitutes negotiation.

Other contractual activity, significantly TitleMax's perfected of its security interest that forms the basis for the loan, received money, including a vehicle, all of which occurred in North

---

[1] https://dictionary.cambridge.org/dictionary/english/discussion (US)

4

Carolina—any of which would be enough under the statutes.

The additional discussion and negotiation that occurred after Claimant arrived at TitleMax in Virginia is irrelevant. To avail itself of the safe-harbor of N.C. Gen. Stat. § 53-190(a) **all** discussion and negotiations must occur **entirely** outside of North Carolina. This is plainly not the case here.

Lastly, TitleMax's argument that it is not subject to North Carolina law because it has not sought to enforce the loan in this state is without merit. TitleMax enforced the loan in this state by perfecting its security interest with the North Carolina Department of Motor Vehicle. TitleMax accepted payments from North Carolina. Indeed, it is TitleMax's collection of payments from North Carolina that forms the basis for Plaintiff's claim of damages under N.C. Gen. Stat. § 53-166(d). And then, the largest enforcement of all incurred, going to a man's home and taking his car from him. Perfecting a security interest and accepting payments are also both enforcement of Claimant's obligations under the loan. There is no indication that the legislature intended to limit the application of the Act to situations where the out of state lender filed suit against a borrower in North Carolina as TitleMax suggests. Indeed, why would they file when they already took the car? What more than that is "shall be enforced in this State."? NC Gen Stat. 53-190(a).

## II. TitleMax is Subject to the North Carolina Consumer Finance Act Pursuant to N.C. Gen. Stat. § 53-190(b).

TitleMax is also subject to North Carolina law pursuant to N.C. Gen. Stat. § 53-190(b) because it solicits or otherwise comes in to North Carolina law with regard to its loans. The Act at N.C.G.S. § 53-190(b) applies to these loans because Respondent routinely "comes into this State to solicit or otherwise conduct activities" in connection with its car title lending business. The record evidence establishes that:

1. Respondent and its affiliates regularly solicit, discuss, make loan offers and

5

receive acceptances of those offers from North Carolina residents. (Affidavit of Respondent's former employee Jessica Crowley). (Declaration of Respondent's former employee Darren Medley)

2. Respondent offers to pay referral fees to North Carolina residents.

3. Respondent routinely solicits, discusses, offers and receives acceptances for its illegal loans in North Carolina (Affidavits of Lorraine White, Stanley Ewings, Kelvin Smith, John Johnson, Melissah Scales, Tamara Davis, Deveda Hines, Howard Welch, Kimberly Morrow, Dominick Hinson and Sharia Brown). Indeed, Respondent's former employee Darren Medley has declared that Respondent makes "significantly more loans to North Carolina residents than Virginia residents" at its store in South Boston, Virginia.

4. Respondent, pursuant to its marketing program, sends text messages into North Carolina.

5. Respondent uses and has used the North Carolina DMV to perfect security interests in motor vehicles owned by thousands of North Carolina residents. (Affidavits of Lorraine White, Stanley Ewings, Kelvin Smith, John Johnson, Melissah Scales, Tamara Davis, Deveda Hines, Howard Welch, Kimberly Morrow, Dominick Hinson and Sharia Brown)(Affidavit of Tyrone Mance)

6. Respondent routinely accepts loan payments from North Carolina. (Affidavits of Lorraine White, Stanley Ewings, Kelvin Smith,

Melissah Scales, Tamara Davis, Deveda Hines, Howard Welch,

Kimberly Morrow, Dominick Hinson and Sharia Brown) (Affidavit of

Tyrone Mance)

7.  Respondent routinely re-enters North Carolina to take possession of

collateral motor vehicles.  (Affidavits of Lorraine White, Stanley

Ewings, Kelvin Smith, John Johnson, Melissah Scales, Tamara Davis,

Deveda Hines, Howard Welch, Kimberly Morrow, Dominick Hinson

and Sharia Brown)

The remedy for a violation of the Act (either (a) or (b)) is set forth in N.C.G.S. § 53-166(d) which makes allows compensatory relief and states that loans that violate the Act "shall be void and the licensee or any other party in violation shall have no right to collect, receive or retain any principal whatsoever with respect to such loan."  Accordingly, Claimant seeks compensatory damages for the payments and the Fair Market Value of the car.

Of course the timeline from TitleMax's own documents confirm the veracity of Mr. Hinson's testimony that he made four payments of  $172.82.  They concede one payment was made in August, 2016 and its likely their records are just inadvertently wrong.  But the other three payments make sense with the call log of September, October, and November, 2016 reflecting Claimant's calls to arrange payment.  TitleMax documents are just in error—likely negligently rather than intentionally.  Mr. Hinson though knows his payments, and his version of events was confirmed by documents produced at the hearing that he had never even seen at the time of his testimony.  It is noteworthy that they called not as single witness from the Martinsville location to contradict any communications with Mr. Hinson or payment history. Nor do they proffer any explanation for why they can convert Mr. Hinson's vehicle from his new address—but can't bother

7

to send a letter this easily ascertained location. Indeed, TitleMax's own documents produced only af the hearing show they knew Hinson had departed the old address from their own call log. The timeline is also consistent with the repossession of the car not occurring until December—after the payment was missed at that time. The total payments therefore were $691.28 rather than $172.82. It is also sensible to conclude that the fair market value of the car at the time of taking was $6,400 as suggested by the expert Mr. Spears, who has passed Daubert scrutiny for hundreds of care in the Middle District. Even Ms. Garner from TitleMax concedes that the auto auction prices are less than Fair Market Value, and her concession of course was a reasonable one to eventually make. Therefore, the total amount TitleMax took from Claimant on this $1,000 loan was $7,091.28 which included the four payments and the Fair Market Value of the car at the time of taking. This was hardly a situation, as Ms. Garner preferred, where TitleMax was doing the Claimant a "favor."

## III.    Having First Subjected Itself to North Carolina Law, TitleMax Cannot Later Contract Around its Effect.

TitleMax's efforts to contract around the statutes must also fail.  First, the choice of law provision is invalid.  Every case that TitleMax relies upon for the enforcement of a choice of law provision is a commercial case (to which the North Carolina Consumer Finance Act would not apply) or a consumer case, *Keena v. Groupon, Inc.*, 192 F.Supp.3d 630 (W.D.N.C. 2016) where choice of law was not in dispute and had nothing to do with interest rates.  Indeed, all the reported authority it to the contrary—the Consumer Finance Act applies regardless of a choice of law provision in the loan agreement.  The North Carolina Business Court in *State v. Western Sky Fin., LLC*, 2015 NCBC 84 (2015), makes clear that "[t]he North Carolina Supreme Court has held that a contract made in a foreign state or country with the intent and propose to avoid the usury laws of this State is invalid and the interest laws of North Carolina are applicable." *Id.* at ¶37 (quoting

8

*Bundy v. Comm. Credit Co.*, 200 N.C. 511, 517-18 (1931)). The Business Court further recognized that North Carolina courts do not enforce choice of law provisions where the chosen law "would violate a fundamental policy of [North Carolina] of otherwise applicable law." *Id.* at ¶39. (citing *Behr v. Behr*, 46 N.C. App. 694, 696 (1980)). The choice of law provision, which TitleMax obtained only after it had subjected itself to North Carolina, does not apply.

Further, the legal doctrine *Lex loci contractus* does not apply. Such an application would render N.C. Gen. § 53-190 inert, given that the only loans the section governs are "loans made elsewhere." The Supreme Court of North Carolina, addressing a similar conflict of law issue in the insurance context, held that where a statute (in that case N.C. Gen. Stat. § 58-3-1) deems a contract to be subject to North Carolina law, North Carolina law applies even where *lex loci contractus* would otherwise cause the law of a different state to apply. *Collins & Aikman Corp. v. Hartford Acc. & Indem. Co.*, 436 S.E.2d 243, 244-45, 335 N.C. 91 (1993). N.C. Gen. Stat. § 53-190 is analogous. Section 53-190 expressly provides that North Carolina law applies, as does Section 24-1.1, *et seq*. That the application of *lex loci contractus* might yield a different result does not matter. The statutes prevail.

## IV.    Claimant should also recover under North Carolina General Statute § 75-1.1.

Claimant also asks the Arbitrator to award treble damages pursuant to the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §75.1.1 *et seq*., in connection with Claimant's claim for damages under the North Carolina Consumer Finance Act. The fundamental purpose of Chapter 75 is to protect North Carolina consumers. The Courts look to that purpose in deciding whether Chapter 75 applies to any given factual situation. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (1999) A business practice is actionable under Chapter 75 when it can be considered unethical, unscrupulous or deceptive. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145

9

(1987).

A violation of Chapter 53 is a violation of Chapter 75 as a matter of law. *State of NC v. NCCS Loans,* 624 S.E.2d 371, 378, 174 N.C. App. 630 (2005) squarely addresses this issue. There, the Court held:

> Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive practices." *Stanley v. Moore,* 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995). In this regard, we note that it is a "paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1 (2003). Defendants' practice of offering usurious loans was a clear violation of this policy. We conclude that the trial court did not err by ruling as a matter of law that this constitutes unfair or deceptive trade practices, in violation of N.C. Gen. Stat. § 75-1.1 (2003).

Additionally, *Odell v. Legal Bucks,* LLC, 665 S.E.2d 767 (N.C. App., 2008) is analogous to the matter before the Arbitrator. The *Odell* Court held:

> Although Defendants disclosed the terms of the advance to Plaintiff, Defendants did not inform Plaintiff that she was executing a contract that violated the Consumer Finance Act. Therefore, Defendants' conduct "had the capacity to deceive," as Defendants did not disclose the actual nature of the transaction to Plaintiff. Further, Defendants' contract with Plaintiff for an illegal advance violated "the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." N.C. Gen. Stat. § 24-2.1(g) (2007). On these facts, we hold that Defendants committed unfair and deceptive trade practices as a matter of law.

As establish, *supra, a*t no time did Claimant know that the loan contracts Claimant entered into with Respondent were unlawful and Respondent surely did not inform Claimant of this fact. (Exhibit 1 at ¶ 18)

Another North Carolina arbitrator recently found that TileMax's exact conduct here constitutes Unfair & Deceptive Trade Practices, and well-respected North Carolina Judge also just (November, 2020) rejected an attempt by AutoMoney to have such a claim dismissed. Both are attached. It is conceded, of course, that neither have precedential

value before this arbitrator. However, TitleMax continues to fulcrum its defenses around other arbitrators—who have no judicial authority or are subject to appellate review. The law is bad for TitleMax that their latest tactic is to masquerade as law an arbitration order--that a former defeated Republican partisan Supreme Court Justice (Robert Edmunds) has some type of judicial authority when he recently sided with them as an arbitrator. Justice Edmunds, like Justice Newby, would be with the corporation no matter the law of course. But Justice Edmunds to be clear is no longer a Justice (after being defeated by Justice Michael Morgan in 2016)—and was rarely even in the majority on the Supreme Court anyway—and his nonjudicial opinion as an arbitrator cannot undo a North Carolina statute. Instead, Claimant respectfully asks that this arbitrator apply the law as it exists—using actual caselaw and the current North Carolina statutes. Doing so, will result in the same outcome as reached by Arbitrator Petelle in the attached opinion.

Plainly, Respondent's conduct in making Claimant loans with an annual rate of interest in excess of 150% in violation of the Consumer Finance Act, in not disclosing to Claimant the illegality of the loan and thereafter re-entering North Carolina to seize and sell his motor vehicle offend the sound public policy of North Carolina and are unfair, unethical and unscrupulous business practices within the meaning of Chapter 75. Accordingly, as such Claimant seeks treble damages in the amount of $21,273.84.

## V.     Respondent's Choice Of Law Provision Does Not Prevent The Application Of North Carolina Law To Respondent's Tortious Activities In North Carolina.

The centerpiece of Respondent's defense is an argument that a choice of law provision it included in its loan agreements allows Respondent to contract its way out of compliance with North Carolina law, even when it engages in the in-state tortious conduct established herein.

11

Respondent has also argued that because the loan documents were executed in Virginia, the doctrine of *lex loci contractus* requires the application of Virginia law.

### A.   Because Of Respondent's Conduct, The Loan, By Law, Is Deemed To Have Been Made in North Carolina.

Chapter 24 of the North Carolina General Statutes governs lawful interest rates in North Carolina. The Chapter describes the transactions it governs at N.C. Gen. Stat. § 24-2.1:

Transactions governed by Chapter.

(a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.

(b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.

(c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

(d) Any oral or written offer, acceptance, solicitation or communication to lend or borrow, made in this State to, or received in this State from, a borrower who is not a resident of this State shall be subject to the provisions of this Chapter, applicable federal law, law of the situs of the contract, or law of the residence of any such borrower as the parties may elect.

(e) Any person who acquires a right by contract or by assignment to receive payments under a loan made in this State to an individual or individuals who is a resident of this State at the time of the loan and who benefits from the laws of this State by having the loan secured by real property located in this State is deemed to have consented to the courts of this State having jurisdiction over such person for any claim under this Chapter and for any claim related to the loan instrument.

(f) The provisions of this section shall be severable and if any phrase, clause, sentence or provision is declared to be invalid, the validity of the remainder of this section shall not be affected thereby.

(g) It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws. Any

12

provision of this section which acts to interfere in the attainment of that public policy shall be of no effect. (1979, c. 706, s. 3; 1983, c. 126, s. 11; 2007-351, s. 3.)

Respondent discussed the product with Claimant in North Carolina for the purpose of selling Claimant a loan. Respondent asked Claimant to provide loan qualifying information, which Claimant provided. Respondent asked Claimant for information regarding Claimant's motor vehicle, which was also provided. Respondent asked if Claimant wanted the loan and after Claimant responded affirmatively Respondent instructed Claimant to drive to Respondent's office in Martinsville, Virginia. These discussions, without question, were a "solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State" and are subject to North Carolina law pursuant to N.C. Gen. Stat. § 24-2.1(b). Comparing Respondent's actions to the provisions of Section 24-2.1, Respondent's loan, by law, is deemed to have been made in North Carolina and is therefore are subject to North Carolina lending laws.

**B. North Carolina Law Applies To Respondent's Activities in North Carolina.**

The North Carolina Business Court in *State v. Western Sky Fin., LLC*, 2015 NCBC 84 (2015)(Exhibit 3), another predatory lending case, observed that "[t]he North Carolina Supreme Court has held that a contract made in a foreign state or country with the intent and propose to avoid the usury laws of this State is invalid and the interest laws of North Carolina are applicable." *Id.* at ¶37 (quoting *Bundy v. Comm. Credit Co.*, 200 N.C. 511, 517-18 (1931)). The Business Court further recognized that North Carolina courts do not enforce choice of law provisions where the chosen law "would violate a fundamental policy of [North Carolina] of otherwise applicable law." *Id.* at ¶39. (citing *Behr v. Behr*, 46 N.C. App. 694, 696 (1980)). With this well-settled principle of law in mind, the Business Court held that "[t]he North Carolina usury statute makes clear that '[i]t

13

is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.' " *Id.* By charging Claimant, a North Carolina resident, an annual rate of interest of connection with the car title loan at issue Respondent clearly has violated the sound public policy of North Carolina. The Arbitrator should follow the lead of the North Carolina Business Court in *Western Sky.*

Furthermore, there is ample record evidence to support a finding that Respondent, with intent and purpose, attempts to avoid the consumer finance and usury laws of North Carolina. The record evidence establishes that Respondent actively works to obtain North Carolina resident borrowers. (Crowley Affidavit and Medley Declaration)

>    **C.    North Carolina Law Alternatively Applies Because The Subject Loan Was Secured By Claimant's North Carolina Motor Vehicle.**

A loan made to a North Carolina resident which is secured by realty or personalty that is located in North Carolina is subject to North Carolina law. *Equilease Corp. v. Belk Hotel Corp.,* 256 S.E.2d 836, 42 N.C. App. 436, *pet. disc. rev. denied,* 261 S.E.2d 121, 298 N.C. 568 (1979). In *Equilese,* a lender filed suit against a borrower after the borrower defaulted on a loan secured by two elevators that were located in a building in North Carolina. The defendant borrower claimed the interest rate in the loan agreement was usurious. *Id.* at 837. The court, upon surveying North Carolina case law, noted that "without qualification" a loan secured by real estate located in North Carolina is subject to North Carolina interest and usury laws. *Id.* at 837-38. The *Equilese* court went on to hold that that rule applies equally to transactions which are secured by North Carolina personalty, as is plainly the case with the car title loan transactions at issue here. *Id.* at 839. The *Equilease* Court stated:

>    We have been presented with no authority or reasoning to compel us to reach the conclusion that the choice of the applicable usury law must depend upon whether the two Otis elevators securing plaintiff's loan are characterized as realty or

14

personalty. If indeed North Carolina's policy is to subject foreign lenders to our usury laws in exchange for their use of North Carolina property as security, as it apparently is, then the Meroney Rule must apply with equal force to loans secured by North Carolina realty and personalty. Indeed, according to the Uniform Commercial Code, G.S. 25-9-102(1), North Carolina law governs the effect of a security instrument in personal property and fixtures just as it governs the effect of deeds of trust on interests in real property.

*Id.* The loans at issue were secured by Claimant's motor vehicles which were titled and located in North Carolina. Therefore, and pursuant to the holding in *Equilese,* North Carolina laws (the Consumer Finance Act, Chapter 75 and Chapter 24) apply to these loans.

## VI.     The Dormant Commerce Clause Does Not Bar Claimant's Claims Against Respondent.

Respondent also argues that the North Carolina Consumer Finance Act violates the dormant Commerce Clause and asks the Arbitrator to so find.    Respectfully, the Arbitrator should apply the law as he finds it. Actively changing current law or declaring statutes unconstitutional is not in the province of an arbitrator. *Geras v. Lafayette Display Fixtures, Inc.,* 742 F.2d 1037, 1052 (1984)(Posner, J., dissenting on other grounds)(Arbitrators' "decisions carry no official imprimatur. They never hold statutes unconstitutional.") Unless and until a court of competent jurisdiction declares the North Carolina Consumer Finance Act unconstitutional the Act is good law that controls Claimant's claims.

### A.     N.C.G.S. §53-190 Does Not Implicate The Dormant Commerce Clause.

By its terms, N.C.G.S. §53-190(b) limits the reach of that statute only to those lenders who engage in lending and lending-related activities within the borders of the State of North Carolina. The statute reads: "If any lender or agent of a lender who makes loan contracts outside this State in the  amount or of the value of fifteen thousand dollars ($15,000) or less, *comes in to this State* to solicit or otherwise conduct activities in regard to such loan contracts then such lender shall be subject to the requirements of this Article."    N.C.G.S. §53-190(b)(2015)(emphasis added). In

15

enacting this law, the North Carolina legislature in no way sought to, or attempted to, regulate the commercial activities of lenders in states other than North Carolina. Rather, the legislature exercised its lawful authority to pass a law that governs conduct that occurs in North Carolina. As such, the statute does not trigger any dormant Commerce Clause concerns whatsoever.

N.C.G.S. §53-190(a) is likewise appropriately circumscribed. In pertinent part, that statute expressly exempts from its grasp those lenders whose loan contracting activities (i.e., solicitation, discussion, negotiation, offer and acceptance, etc.) occur entirely outside of the State of North Carolina. Plainly, the legislature was mindful of the constitutional limitations on its law-making authority when it carefully crafted N.C.G.S. §53-190.

Respondent, however, systematically and by design enters into North Carolina, both actually and virtually, in furtherance of its lending business that violates the consumer finance laws of this state. Respondent solicits North Carolina residents for its loan products when those residents are physically present in the state. Respondent discusses, negotiates, offers and receives acceptances for its loan products at times when its customers are physically within the borders of North Carolina. Respondent accepts payments from North Carolina. And, most significantly, Respondent has registered with the state as a motor vehicle lienor and it uses North Carolina state law and the North Carolina Department of Motor Vehicles to perfect and enforce its security interests in North Carolina titled and registered motor vehicles, which vehicles Respondent later repossesses from North Carolina using the state's self-help laws. In other words, Respondent avails itself of the benefits and protections of the laws of North Carolina when and where Respondent profits from those laws, yet Respondent claims immunity from North Carolina law here.

**B.     N.C.G.S. §53-190 Survives A Dormant Commerce Clause Analysis.**

In the event the application of N.C.G.S. §53-190 to Defendant's in-state lending activities somehow impacts Defendant's conduct outside of North Carolina, that impact is evenhanded, at most indirect, in furtherance of a legitimate state interest and thusly constitutionally permissible.

The constitutional grant of authority to Congress to regulate interstate commerce is understood to provide "protection from state legislation inimical to the national commerce even where Congress has not acted." *Barclays Bank, PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 114 S. Ct. 2268, 129 L. Ed. 2d 244 (1994). This negative command, known as the dormant Commerce Clause, prohibits States from legislating in ways that impede the flow of interstate commerce. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.* 514 U.S. 175, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995). This "principle against extraterritoriality" is born of the notion that "a State may not regulate commerce occurring <u>wholly</u> outside of its borders." *Healy v, Beer Inst.*, 491 U.S. 324, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)(emphasis added). However, the limitation the dormant Commerce Clause places upon State power is by no means absolute. "In the absence of conflicting federal legislation the States retain authority under their general police powers to regulate matters of legitimate local concern even though interstate commerce may be affected." *Lewis v. BT Investment Mgrs., Inc.*, 447 U.S. 27, 100 S. Ct. 2009, 64 L. Ed. 2d 702 (1980).

In determining whether a state statute violates the dormant Commerce Clause, the courts conduct a two-tiered analysis. *Environmental Technology Council v. Sierra Club*, 98 F.3d 774 (4th Cir. 1996). When a state statute directly regulates or discriminates against interstate commerce, or when the effect is to favor in-state economic interests over out-of-state interests, the statute is generally struck down without further inquiry. *Brown-Foreman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L. Ed. 2d 552 (1986.) Defendant cannot claim that N.C.G.S. §53-190 directly regulates the interest rates it may charge in states other than North

17

Carolina. The statute does not dictate what interest rates Defendant may charge its borrowers in other states nor does it require Defendant to lend in other states at the rates of interest required by North Carolina law. Rather, N.C.G.S. §53-190 governs Defendant's loans *only* when Defendant chooses to enter into the State of North Carolina for the purpose of engaging in conduct and activities that further its lending business. Furthermore, N.C.G.S. §53-190 does not discriminate in favor of North Carolina car title loan lenders and against Defendant. Domestic lenders are not permitted to charge higher rates of interest than Defendant.

When a statute does not discriminate against interstate commerce, as is the case here, but rather regulates evenhandedly and only indirectly affects interstate commerce, the courts conduct a balancing test to determine whether the state's interest in enacting the challenged legislation is legitimate and whether the burden on interstate commerce clearly exceeds the putative local benefits.[2] *Brown-Foreman*, 476 U.S. at 579.

Respondent surely cannot argue that North Carolina does not have a legitimate interest in protecting its citizens from predatory lending practices. It is the well-settled law of this state that the North Carolina usury and unfair trade practices statutes were enacted to protect North Carolina consumers, a purpose that is "squarely within this State's ability to shelter its people ... from fraud*." See Western Sky*. In *Western Sky*, the North Carolina Business Court, citing *Aldens, Inc. v. Packel*, 524 F.2d 38 (3rd Cir. 1975) observed that "Congress has deferred to the states on the matter of maximum interest rates in consumer credit transactions." The Business Court further observed that "courts throughout the United States have consistently allowed states to regulate the

_____

[2] It is highly unlikely that N.C.G.S. §53-190 in any manner adversely affects Respondent's lending business in any states other than North Carolina and, to the extent such affects have occurred, there is zero record evidence of the volume and scope of those affects such that the Arbitrator may do a meaningful balancing test.

18

content of loan contracts made by out-of-state lenders to resident borrowers." *Western Sky*, citing *State of Minn. V. CashCall, Inc.*, No. 27-CV-12740 (Minn. Dist. Ct. Sept 6, 2013)).

The Business Court in *Western Sky* rejected a defense challenge that the North Carolina Usury Statute, N.C.G.S. §24-1.1, and the North Carolina Consumer Finance Act, N.C.G.S. §53-164, *et seq.*, violated the dormant Commerce Clause as those statutes were being applied to the conduct of the predatory lender that was the target of state enforcement action in that case. In rejecting that challenge the Business Court held that "[t]he statutes at issue do not attempt to regulate conduct beyond North Carolina's borders and do not unduly burden interstate commerce." The Court further observed that "[t]he statutes do not purport to dictate the interest rates or other lending practices that Defendants apply in any state other than North Carolina." The Court concluded, after engaging in a balancing analysis pursuant to *Brown-Foreman*, that "the State's application of the relevant statutes to the loans at issue does not violate the dormant Commerce Clause." It is inarguable that the longstanding and well-settled right of the State of North Carolina to protect its citizens from predatory lending practices far outweighs whatever incidental impacts its laws may have on interstate commerce.

Respondent relies heavily on a Seventh Circuit opinion—*Midwest Title Loans v. Mills*—for its argument that the applicable North Carolina laws are unconstitutional. This argument fails for several reasons. First, *Midwest Title Loans* is distinguishable on its facts. *Midwest Title Loans* addresses the authority of the State of Indiana to force a title lender to register to conduct business in Indiana. It does not address, and expressly distinguishes, the question of whether Indiana law would apply to a consumer loan transaction with a Hoosier in an Indiana Court. The Court observed:

> Midwest has yet to sue any of its title borrowers. But if there were a suit, an Indiana court might rule that Indiana had the "most intimate contacts" with the transaction

19

and therefore that its law applied even though the loan had been made in Illinois. Or it might rule that Illinois's failure to limit the interest rates in title loans was so offensive to the public policy of Indiana that the Illinois law would not be enforced in Indiana – in which event the Indiana courts might refuse to apply Illinois law even if Midwest's contracts contained a choice of law clause directing that Illinois govern a suit arising from the contract – which they do. In short, a particular set of facts giving rise to litigation [can] justify, constitutionally [that is, under the due process clause] the application of more than one jurisdiction's laws.

*Id.* at 668 (internal citations omitted) And, again, the North Carolina Business Court expressly addressed this issue in its post-*Midwest Title Loans* decision and rejected the argument that Respondent now makes. The North Carolina Business Court opinion is much more persuasive, because it: (a) addresses the factual and legal issues here - whether North Carolina law may permissibly apply to consumer loans with North Carolina residents when contractual activities take place in North Carolina; and (b) deals directly with the North Carolina consumer protection statutes at issue here, rather than an Indiana registration requirement.

**CONCLUSION**

For the reasons stated herein, Claimant respectfully asks the Arbitrator to make the following Awards:

1. That Claimant have and recover of Respondent the amount of $7,091.28 for claims pursuant to the North Carolina Consumer Finance Act, with said amount then trebled to $21,273.84 for Claimant's claim pursuant to the North Carolina Unfair and Deceptive Trade Practices Act;

2. That Claimant recover attorneys' fees pursuant to Chapter 75 of $10,000;

3. That Claimant have and recover reasonable attorneys' fees pursuant to N.C.G.S. §75.-16.1.

Respectfully submitted, this 4th day of December, 2020.

Drew Brown
Attorney for Claimant

FOR THE FIRM:

**BROWN, FAUCHER, PERALDO & BENSON, PLLC**
822 North Elm Street, Suite 200
Greensboro, NC 27401
(336) 478-6000 (telephone)
(336) 273-5597 (facsimile)
drew@greensborolawcenter.com

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served a copy of the foregoing document and exhibits in the above-entitled action upon all other parties to this cause by email addressed to the parties as follows:

>Jason D. Evans
>Troutman Sanders LLP
>301 South College St.
>Suite 3400
>Charlotte, NC 28202
>Jason.Evans@troutman.com

This the 4th day of December, 2020

_____
Drew Brown
Attorney for Claimant

FOR THE FIRM:

**BROWN, FAUCHER, PERALDO & BENSON, PLLC**
822 North Elm Street
Greensboro, NC 27401
(336) 478-6000 (telephone)
(336) 273-5597 (facsimile)
drew@greensborolawcenter.com

22

|  |  |
|---|---|
| Dominick Hinson, | ) )<br>)<br>) |
| Claimant, | )<br>) |
| v. | )<br>) |
| TitleMax of Virginia, Inc. | )<br>) |
| Respondent. | )<br>)<br>) |

## AFFIDAVIT OF DREW BROWN

1) I am an attorney licensed to practice in North Carolina. The information in this Affidavit is based on my personal knowledge and belief.

2) Our law firm represents over 600 North Carolinians in matters pending against TitleMax and its related entities.

3) Millions of dollars have been paid to settle over 900 similar claims against TitleMax' competitors.

4) TitleMax, however, despite repeated demands over years, has not offered a single penny to settle any of the matters our firm has pending on behalf of clients around the State of North Carolina.

5) This particular Hinston case is no different and not a single offer of money has been made to settle the case.

6) The time spent since 2018 to get this matter before this arbitrator was exacerbated by months and hundred of hours of road blocks placed in federal court by TitleMax former

law firm, Womble Bond Dickinson (US), LLC.

7) Even at a $250/hour rate (half the normal rate of the undersigned) and a more than reasonable rate for a litigator of suitable experience in the market, work on Claimant's case alone exceeded $10,000 in attorney time from the Undersigned including filing the case, participating in this arbitration process, including the arbitration, and the posthearing briefing.

(FURTHER AFFIANT SAITH NOT)

This the 4th day of December, 2020.

_____
Drew Brown

**BEFORE ME**, the undersigned Notary, _Kellie C. moore_ on this _4_ day of _December_, 2020, personally appeared _Drew Brown_ known to me to be a credible person and of lawful age, who being by me first duly sworn, on his oath, deposed and said the above.

Sworn to and subscribed before me, this the _4_ day of _December_, 2020

_____
Notary Public

_3 - 21 - 22_
My Commission Expires

KELLIE C. MOORE
NOTARY
PUBLIC
ROCKINGHAM COUNTY, NC

AMERICAN
ARBITRATION
ASSOCIATION®

| INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-19-0001-6355

Jennifer W. Snipes, Claimant
-vs-
TitleMax of Virginia, Inc. d/b/a TitleMax, Respondent

## AWARD OF ARBITRATOR

I, James F. Petelle, the UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, having been duly sworn, and oral hearings having been waived in accordance with the rules of the American Arbitration Association (AAA), make the following findings and AWARD after having fully reviewed and considered the documents submitted to me by the parties, each of whom were represented by counsel:

This case involves the extension of a loan to Claimant, a North Carolina resident, secured by an automobile titled in North Carolina, where the loan documents were signed in Respondent's office in Virginia. The loan carried an interest rate of nearly 150%, a rate that clearly violates the North Carolina Consumer Finance Act (the "CFA"), but that is arguably not illegal in Virginia. The question to be resolved is whether the language of the CFA applies to the transaction at issue here. Secondarily, the Respondent argues that if the language of the CFA is read to apply to the transaction at issue here, then the CFA would be unconstitutional under the Commerce Clause. For the reasons set forth below, I hold that the CFA does apply to this transaction and that Claimant accordingly is entitled to recover damages from Respondent.

The CFA provides, at Section 53-190(a), that it applies to an out-of-state lender to a North Carolina resident unless "all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds occur entirely outside of North Carolina" (emphasis added). Section 53-190(b) of the CFA further provides that "If any lender or agent of a lender that makes loan contracts outside the State in the amount of fifteen thousand dollars ($15,000) or less comes into the State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article" (emphasis added).

Here, Claimant stated in her deposition that she was originally contacted by Respondent by telephone to solicit her to take out the loan at issue. In support of her claim, Claimant provided affidavits from two of her acquaintances who apparently did business with Respondent and who stated that, in response to a request for referrals of other prospective borrowers, they provided the name and telephone number of Claimant to an employee of Respondent. It is hard to imagine why Respondent's employees would request a telephone number if they didn't intend to call that number. In addition, Claimant provided a very large number of affidavits from other third parties which supported Claimant's argument that Respondent regularly solicited business from North Carolina residents, while those residents were in North Carolina. Tellingly, two of those affidavits were from former employees of Respondent.

On the other hand, Respondent's office manager testified in his deposition that no solicitation by telephone was ever initiated from Respondent's office due to the company's policy prohibiting such solicitation. Since Section

53-190(a) provides that it applies to an out of state lender unless all of the activities listed did not occur outside the State, I believe that Respondent bears the burden of proof on the question whether all such activities were carried out outside of North Carolina, and that Respondent did not carry the burden of proof. Moreover, I would find that Claimant did carry the burden of proof if I believed she was required to do so. Furthermore, while it may be argued that Section 53-190(a) applies only to activities prior to and coincident with the formation of the contract, Section 53-190(b) cannot be read to be so limited when it refers to a lender coming into the State to "otherwise conduct activities in regard to such loan contracts." Respondent came into North Carolina to file a lien on the automobile title, to engage in collection activities, and ultimately to repossess the automobile; all activities which it conducted "in regard to" the loan contract with Claimant. Accordingly, I find that this transaction was subject to the requirements of the CFA.

Respondent also argues that application of the CFA to this transaction would violate the Commerce Clause of the U.S. Constitution. Although it is not clear to me that application of the CFA to an out-of-state lender who loans money to a State resident in any way dis-favors the out-of-state lender when compared to an in-state lender, and thus burdens inter-state commerce, I do not need to decide the constitutional issue as I agree with Claimant's position that an arbitrator should take a state law as it is written; he or she should not presume to rule that a state law is unconstitutional. Accordingly, I decline to rule that application of the CFA to the transaction at issue in this case is unconstitutional.

Claimant has provided reasonable evidence that her actual damages are $4,267.00 and I agree with this calculation. Claimant also proposes that the damages be trebled under North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA), and provided authority that violation of the CFA is a per se violation of the UDTPA, entitling her to those treble damages. I agree with Claimant' argument on this point.

Last, Claimant requests an award of reasonable attorney fees under the UDTPA. That statute provides for recovery of attorney fees where there is a finding that "the party charged has willfully engaged in the act or practice and there was an unwarranted refusal by such party to fully resolve the matter." Although it is clear that Respondent has willfully engaged in the prohibited practices, I have not seen anything in the record regarding efforts to resolve this matter. Accordingly, I decline to award recovery of attorney fees.

In conclusion, I order that Respondent pay Claimant the amount of $12,801.00, which is triple the amount of actual damages that she has proved. The foregoing sum shall be paid on or before 30 days from the date of this Award.

The administrative fees of the American Arbitration Association in the amount of $1,900.00 and the compensation of the Arbitrator in the amount of $1,500.00 shall be borne as incurred.

This award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

11/16/2020
_____
Date

James F. Petelle, Arbitrator

NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 5460

BRENDA WARLEY,

    Plaintiff,

v.

AUTOMONEY, INC.,

    Defendant.

**ORDER DENYING
MOTIONS TO DISMISS**

---

THIS MATTER came on for hearing before the undersigned Superior Court Judge Presiding on Defendant's Motions to Dismiss pursuant to Rules 12(b)(2), 12(b)(3) and 12(b)(6). Plaintiff was represented at the hearing by James Faucher and Jeffrey Peraldo. Defendant was represented at the hearing by Michael Montecalvo. The Court has considered the court file, the arguments of counsel, the submissions of the parties, the evidence submitted in connection with this Motion to Dismiss and the appropriate legal authorities. Based on the foregoing, for the limited purpose of deciding the pending Motions, and without prejudice to either party in further proceedings in this or any other case, the Court hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Defendant has advertised its loans in North Carolina.

2. Defendant has held itself out as having a business location in Charlotte, North Carolina, as having made "thousands" of loans to North Carolinians and as being the "trusted name in title loans" in North Carolina.

3. Defendant has set up stores along the North Carolina-South Carolina border for the stated purposed of marketing directly to and attracting North Carolina borrowers.

4. Defendant engages in telephone discussions regarding the details of its loan products with potential customers while those customers are in North Carolina.

5. Defendant calls potential borrowers who are located in North Carolina.

6. Defendant accepts online inquiries from North Carolina and then makes sales calls to North Carolina to the persons who submitted their contact information to Defendant.

7. Defendant offers loans over the phone to North Carolinians and Defendant receives acceptances of its loan offers by telephone from North Carolinians.

8. Defendant provides information about its loans over the phone to North Carolinians and makes inquiries concerning amounts sought to be borrowed.

9. Defendant directs North Carolina residents to travel out of state to its stores.

10. Defendant tells North Carolina borrowers what documents to bring to take out loans.

11. Defendant perfects security interests using the North Carolina DMV.

12. Defendant accepts payments from North Carolina.

13. Defendant pays borrowers to refer new borrowers from North Carolina.

14. Defendant sends written solicitations into North Carolina.

15. Defendant sends collection letters into North Carolina.

16. Defendant makes collection calls into North Carolina.

17. Defendant directs others to enter North Carolina to take possession of collateral motor vehicles.

18. Brenda Warley is a citizen and resident of Guilford County, North Carolina and was on June 22, 2020.

19. In or about 2018, Brenda Warley got a car title loan from AutoMoney in Rock Hill, South Carolina. Brenda Warley learned about AutoMoney from her brother.

20. Prior to getting the loan, Brenda Warley called AutoMoney from North Carolina. During that telephone call an AutoMoney employee asked Ms. Warley if she was interested in getting a car title loan.

21. The AutoMoney employee asked Ms. Warley for details about her car such as make, model, year, mileage, and condition.

22. The AutoMoney employee asked Ms. Warley how much money she wanted to borrow. Ms. Warley told them $1000.00. The AutoMoney employee told Ms. Warley that AutoMoney could loan her up to $1500.00.

23. The AutoMoney employee asked Ms. Warley if she wanted to get a loan and told Ms. Warley to drive to the AutoMoney store in South Carolina and to bring the title to her car. The loan ended up being $1020.00.

24. AutoMoney put a lien on Ms. Warley's car in North Carolina using the NCDMV.

25. Ms. Warley made payments on the loan over the telephone from North Carolina and Ms. Warley paid off the loan. After Ms. Warley paid off the loan AutoMoney sent her the title back but it did not remove the lien it had put on her car.

26. During argument, the Court requested Plaintiff's counsel to confirm that Plaintiff was not basing its jurisdiction over defendant on General Jurisdiction principals. Counsel for Plaintiff agreed that it was only arguing for Specific Jurisdiction over Defendant. Therefore, the Court's analysis is limited solely to Specific Jurisdiction. Based on the foregoing findings of fact, which are only findings for the purpose of the motions before the Court, the Court makes the following conclusions of law:

## CONCLUSIONS OF LAW

2. North Carolina's long-arm states, in pertinent part, that a court may exercise jurisdiction over a party if it is "engaged in substantial activity in this State, whether such activity is wholly interstate, intrastate, or otherwise." N.C. Gen. Stat. § 1-75.4(1)(d).

3. Under North Carolina's long-arm statute N.C. Gen. Stat. § 1-75.4, North Carolina Courts are permitted to exercise personal jurisdiction over a defendant to the outer limits allowable under federal due process.

4. "The Due Process Clause of the Fourteenth Amendment operates to limit the power of a State to assert *in personam* jurisdiction over a nonresident defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 1871–72, 80 L. Ed. 2d 404, 410 (1984) (citing *Pennoyer v. Neff*, 95 U.S. 714, 24 L. Ed. 565 (1878) ). The primary concern of the Due Process Clause as it

relates to a court's jurisdiction over a nonresident defendant is the protection of "an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181–82, 85 L. Ed. 2d 528, 540 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L. Ed. 95, 104 (1945) ). The United States Supreme Court has made clear that the Due Process Clause permits state courts to exercise personal jurisdiction over an out-of-state defendant so long as the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. at 158, 90 L. Ed. at 102 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L. Ed. 278, 283 (1940)). *Beem USA Ltd.-Liab. Ltd. P'ship v. Grax Consulting LLC*, 373 N.C. 297, 302 838 S.E.2d 158, 261-62 (2020).

5. Personal jurisdiction cannot exist based upon a defendant's "random, fortuitous, or attenuated" contacts with the forum state, *Walden v. Fiore*, 571 U.S. 277, 286, 134 S.Ct. 1115, 1122–23, 188 L. Ed. 2d 12, 21 (2014) (quoting *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183–84, 85 L. Ed. 2d at 543 ), but rather must be the result of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Skinner*, 361 N.C. at 133, 638 S.E.2d at 217 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L. Ed. 2d 1283, 1298 (1958) ). As such, a defendant's contacts with the forum state must be such that a defendant "should

reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L. Ed. 2d 490, 501 (1980) ; *see also Skinner*, 361 N.C. at 133, 638 S.E.2d at 217 ("A crucial factor is whether the defendant had reason to expect that he might be subjected to litigation in the forum state."). *Beem USA*, 373 N.C. at 303, 838 S.E.2d at 162.

6. Under the Due Process Clause, a court can have personal jurisdiction over a defendant in either of two ways: first, a court may find specific jurisdiction based on conduct connected to the suit. If the defendant's contacts with the State are also the basis for the suit, those contacts may establish specific jurisdiction. Second, a court may exercise personal jurisdiction under the theory of general jurisdiction, which requires a more demanding showing of continuous and systematic activities in the forum state. However, the Court is not engaging in a General Jurisdiction analysis because Plaintiff has abandoned that argument.

7. To establish specific personal jurisdiction, the court must determine (a) the extent to which the Defendant purposefully availed itself of the privilege of conducting activities in the forum state; (b) whether the Plaintiffs' claims arise out of those activities; and (c) whether the exercise of personal jurisdiction is constitutionally reasonable.

8. The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Defendant's conduct and connection to the forum must be such that it

should reasonably anticipate being haled into court there. Further, if a defendant has created a substantial connection to the forum, then it has purposefully availed itself of the privilege of conducting business there. So long as the defendant's contact creates a substantial connection with the forum, even a single act can support jurisdiction. *Burger King*, 471 U.S. at 475 n. 18, 105 S.Ct. 2174 (internal quotations omitted).

9. Based upon one or more of the findings of fact, Defendant has purposefully availed itself of the privilege of conducting business in North Carolina.

10. Defendant makes use of the North Carolina Department of Motor Vehicles to perfect their security interests in North Carolina registered vehicles.

11. Defendant has created continuing obligations between itself and borrowers in North Carolina. Where a defendant has created continuing obligations between himself and residents of the forum, it manifestly has availed itself of the privilege of conducting business there.

12. To satisfy the second prong of specific personal jurisdiction, Plaintiff's claims must result from alleged injuries that arise out of or relate to Defendant's above-noted contacts with North Carolina. *Burger King*, 471 U.S. at 472–73, 105 S. Ct. 2174 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984)); *see also Verizon Online Servs., Inc. v. Ralsky*, 203 F.Supp.2d 601, 620 (E.D.Va.2002) ("If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will

be deemed to have arisen from those contacts." (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996)). Accordingly, personal jurisdiction can be appropriate where the injury "would not have occurred but for" a defendant's contacts with the forum State. Id. at 1124. The Supreme Court has also characterized the arising-out-of prong as akin to proximate causation. *See Burger King*, 471 U.S. at 475, 105 S. Ct. 2174 ("Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State."). *Broadus v. Delta Air Lines, Inc.*, 101 F. Supp. 3d 554, 560–61 (M.D.N.C. 2015).

13. Specific jurisdiction is, at its core, focused on the "relationship among the defendant, the forum, and the litigation." *Daimler*, 571 U.S. at 133, 134 S.Ct. at 758, 187 L. Ed. 2d at 637 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579–80, 53 L. Ed. 2d 683, 698 (1977)). Some "affiliatio[n] between the forum and the underlying controversy" is required. *Walden*, 571 U.S. at 283 n.6, 134 S.Ct. at 1121 n.6, 188 L. Ed. 2d at 20 n.6 (alteration in original) (quoting Goodyear , 564 U.S. at 919, 131 S.Ct. at 2850–51, 180 L. Ed. 2d at 803 ). The United State Supreme Court has emphasized that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cty.*, 582 U.S. ——, 137 S. Ct. 1773 1780, 198 L.Ed.2d 395 (2017) (quoting *Goodyear* , 564 U.S. at 919, 131 S.Ct. at 2850–51, 180 L. Ed. 2d at 803 ). *Beem USA L*, 373 N.C. at 303-304, 838 S.E.2d at 162-63.

14. Plaintiff's claims arise from or relate to Defendant's activities in North Carolina.

15. Plaintiff's alleged damages would not have occurred but for Defendant's substantial connection with North Carolina.

16. Plaintiff's claims arise from the Loan Agreement, Promissory Note and Security Agreement that Defendant entered into with Plaintiff or from North Carolina statutes that govern the types of transactions at issue. All of Defendant's contacts with North Carolina, discussed above, arise out of Defendant's title lending business that is the subject of Plaintiff's claims.

17. The exercise of personal jurisdiction is constitutionally reasonable.

18. In making this determination, the court has considered (a) the burden on the defendant of litigating in the forum; (b) the interest of the forum state in adjudicating the dispute; (c) the plaintiff's interest in obtaining convenient and effective relief; (d) the shared interest of the states in obtaining efficient resolution of disputes; and (e) the interests of the states in furthering substantive social policies.

19. Defendant has not demonstrated any burden it will face litigating in North Carolina.

20. The State of North Carolina has a strong interest in the enforcement of its consumer protection law and in protecting its citizens from what under North Carolina law are usurious loan rates.

21. It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.

N.C. Gen. Stat. § 24-2.1(e)

22. Plaintiff has an interest in obtaining convenient and efficient resolution of disputes which can be effectuated by jurisdiction over this dispute in the courts of North Carolina.

23. When deciding a Rule 12(b)(6) motion, the well-pleaded allegations of the complaint are taken as true.

WHEREFORE, based upon the foregoing findings of fact and conclusions of law, the Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

Defendant's Motion to dismiss for improper venue is DENIED, in the Court's discretion. Venue is proper in Guilford County because Plaintiff was (and remains) a resident of Guilford County at the time this matter was filed.

Defendant's Motion to Dismiss for Failure to State a Claim upon which relief can be granted is DENIED. This Order denying Defendant's Rule 12(b)(6) motion is without prejudice to the Court making a determination on any choice of law issue in the future based upon a more complete evidentiary record.

So Ordered.

The _____ 23rd _____ day of November, 2020

R. Stuart Albright

The Hon. R. Stuart Albright
Superior Court Judge Presiding

1961 Version

PLAINTIFF'S EXHIBIT
C-6

when appointed and qualified, shall have such powers and duties as to custody, collection administration, winding up, and liquidation of such property and business as shall from time to time be conferred upon him by the court. (1957, c. 1429, s. 6; 1961, c. 1053, s. 1.)

§ 53-188. **Review of regulations, order or act of Commission or Commissioner.**—The Commission shall have full authority to review any rule, regulation, order or act of the Commissioner done pursuant to or with respect to the provisions of this article and any person aggrieved by any such rule, regulation, order or act may appeal to the Commission for review upon giving notice in writing within twenty (20) days after such rule, regulation, order or act complained of is adopted, issued or done. The validity of any rule, regulation, order or act of the Commission shall be subject to judicial review as provided in article 33, chapter 143 of the General Statutes of North Carolina. (1957, c. 1429, s. 6; 1961, c. 1053, s. 1.)

§ 53-189. **Insurance.**—(a) Credit Life Insurance.—The amount of credit life insurance shall not exceed the original indebtedness, but this insurance may be carried on the loan to maturity at level term.

(b) Credit Accident and Health Insurance. — The amount of periodic indemnity payable with respect to any one installment payment period by credit accident and health insurance in the event of disability, as defined in the policy, shall not exceed the original amount of the loan divided by the number of periodic installment payment periods, and such insurance shall not extend over any longer period of time than the loan contract.

(c) Group Contracts for Insurance; Insurance to Be Required of Only One Obligor.—Notwithstanding any other provision of this article, a licensee may sell such insurance or provide the same under a group contract, subject to the applicable laws of the State relating to insurance. Any gain or advantage in the form of commission or otherwise, to the licensee or to any employee, affiliate, or associate of the licensee from such above described insurance or its sale shall not be deemed to be an additional or further charge in connection with the contract of loan. No insurance authorized by subsections (a) and (b) of this section shall be required with respect to more than one obligor of any one loan contract.

(d) When Credit, etc., Insurance Not to Be Required. — Notwithstanding any other provisions of this article, no licensee shall require any borrower to obtain credit accident and health insurance when a loan is secured by collateral consisting of personal property with respect to which property loss insurance has been required to be obtained.

(e) Licensee Not to Receive Commissions, etc., on Property Loss Insurance. —No licensee shall directly or indirectly receive any commission, premium or profit from the sale of any property loss insurance on any property used as collateral to secure any loan made pursuant to the provisions of this article.

(f) Sale to Comply with Chapter 58 of G. S.—Notwithstanding any other provisions of this section or article, nothing herein contained shall be construed to authorize the sale of insurance in violation of any of the provisions of chapter 58 of the General Statutes or the rules and regulations promulgated pursuant thereto. (1961, c. 1053, s. 1.)

§ 53-190. **Loans made elsewhere.**—No loan contract made outside this State in the amount or of the value of six hundred dollars ($600.00) or less for which a greater consideration, or charges than is authorized by § 53-173 of this article has been charged, contracted for, or received shall be enforced in this State and every person in anywise participating therein in this State shall be subject to the provisions of this article; provided, that the foregoing shall not apply to loans legally made in another state. (1961, c. 1053, s. 1.)

§ 53-191. **Businesses exempted.** — Nothing in this article shall be construed to apply to any person, firm or corporation engaged solely in the business

93


## § 53-190. Loans made elsewhere.

(a)     No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.

(b)     If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article.

(c)     No lender licensed to do business under this Article may collect, or cause to be collected, any loan made by a lender in another state to a borrower, who was a legal resident of North Carolina at the time the loan was made. The purchase of a loan account shall not alter this prohibition.  (1961, c. 1053, s. 1; 1967, c. 769, s. 2; 1969, c. 1303, s. 13; 1973, c. 1042, s. 8; 1979, c. 706, s. 2; 1989, c. 17, s. 11; 2015-179, s. 5.)

EXHIBIT G

Case 1:19-cv-00489-LCB-JLW   Document 116-1   Filed 02/01/21   Page 38 of 38