## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-22-0000-1844

| | |
|---|---|
| Alicia Adams | Claimant |
| -vs- | |
| TitleMax of South Carolina, Inc. | Respondent |

### ORDER ON DISPOSITIVE MOTIONS AND INTERIM AWARD OF ARBITRATOR

I, Edward F. Hennessey, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly considered the proofs and allegations of the Parties, each represented by counsel, do hereby, ORDER and issue this INTERIM AWARD, as follows:

The June 29, 2022 Scheduling Order (hereinafter "SO") in this matter permitted, as each party had requested, the filing of dispositive motions along with supporting briefs and exhibits. The SO also provided for an evidentiary hearing "if necessary, following the Arbitrator's ruling on cross-dispositive motions." Each party timely filed both a dispositive motion, with briefs and exhibits, and a brief and exhibits opposing its counterpart's dispositive motion. Following the SO dates for submissions related to dispositive motions, each party submitted a recently-issued judicial submission, as additional material in its favor on dispositive motions. I accepted these decisions as timely in respect of the motions.

Claimant has been a North Carolina resident since about May 20, 2015, and resided in North Carolina at all times relevant to the transactions that are the subject of this Order on Dispositive Motion and Interim Award of Arbitrator (hereinafter "Interim Award"). Respondent, physically located in South Carolina, makes loans secured by car titles. Respondent made a series of such loans to Claimant.

These loans, as extended by Respondent to Claimant, were subject to provisions of Chapters 53 and 24 of the North Carolina General Statutes. The parties' submissions detail, exhaustively, each of their perspectives on why these statutes can or cannot, or should or should not, apply. Respondent does not dispute that its loans to Claimant were on terms that violate the statutes if they apply. They do.

Claimant's January 13, 2022 Demand for Arbitration says the amount in dispute is the "[a]mount paid or collected x 3," along with interest and arbitration costs. The "x 3" signifies a claim for treble damages under Chapter 75 of the North Carolina General Statutes (the UDTPA).

Claimant attests that she paid Respondent $15,605.32. Respondent disputes that total, but admits Claimant made payments and specifies no different total. So I determine that Claimant paid $15,605.32, and that this is what Respondent owes her as base damages.

Claimant commenced this matter by her April 4, 2019 filing of a lawsuit against Respondent. Respondent owes her prejudgment interest on base damages from that date at the North Carolina legal rate of 8%.

I also determine that Respondent violated the UDTPA, and is on that basis subject to treble damages. That

Case Number: 01-22-0000-1844                                     1

relief represents an additional principal amount of $31,210.64 (2 x $15,605.32) due from Respondent to Claimant. That additional amount is subject to interest at the North Carolina legal rate of 8% from the date of this Interim Award.

This Interim Award fully resolves all claims and issues pending between the parties in this matter, other than that of what attorney fee, if any, to award to Claimant under N.C. Gen. Stat. §75-16.1. Respondent willfully engaged in the acts and practices that support its liability, but I have no evidence whether it refused without warrant fully to resolve this matter (I acknowledge verbiage on this subject in Claimant's briefing, but that is not evidence).

To permit me to dispose of the attorney fee issue by a Final Award, the parties shall proceed as follows:

1. Claimant shall submit no later than twenty (20) calendar days from the date of filing of this Interim Award what it wishes me to consider regarding the fee issue;

2. Respondent shall submit no later than twenty (20) calendar days from the date of the filing by Claimant in respect of the attorney fee issue what it wishes me to consider on the issue.

I will issue a Final Award resolving the fee issue within fourteen (14) days of my receipt of the last of these fee-related submissions. If the parties are able to resolve the fee issue between them, if Claimant opts not to pursue the fee issue, or if Respondent opts not to make a submission in response to a Claimant submission, the parties or relevant party should so notify the AAA. Within fourteen (14) days of my receipt of such a notice, I will issue a Final Award (which, if the fee issue is resolved by the parties or not further pursued by Claimant, would be in substance this Interim Award).

The administrative fees of the American Arbitration Association (AAA) totaling $1,900 shall be borne as incurred, and the compensation of the Arbitrator totaling $2,500 shall be borne as incurred.

In summary, this Interim Award does the following:

1. Requires Respondent to pay Claimant a total principal amount of $46,815.96 (3 x $15,605.32);

2. Requires Respondent to pay Claimant prejudgment interest at 8% from April 4, 2019 on $15,605.32;

3. Requires Respondent to pay Claimant post-award interest at 8% on $31,210.64 from the date of the Interim Award;

4. Denies all claims for relief of either party other than Claimant's request for attorney fees award.

This Interim Award is in full settlement of the merits of all claims submitted in this Arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claim for reasonable attorney fees and costs. Claimant shall submit her accounting of such reasonable attorney fees and costs and any supporting documents related thereto to the Arbitrator within twenty (20) days of this Interim Award. Respondent shall submit any responsive statement and supporting documents within twenty (20) days of Claimant's submission. Upon and after such submissions, the matter shall be deemed submitted to the Arbitrator for determination and Final Award.

Any award issued after the date of this Interim Award shall be deemed to incorporate in full the substance of this Interim Award, and the obligations this Interim Award provides shall remain fully in force.

| 09/12/2022 | |
| --- | --- |
| Date | Edward F. Hennessey, Arbitrator |

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-22-0000-1844

Alicia Adams

                                                                      Claimant

-vs-

TitleMax of South Carolina, Inc.                      Respondent

## FINAL AWARD OF ARBITRATOR

I, Edward F. Hennessey, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award dated September 12, 2022, which is confirmed, adopted, and incorporated as if fully set forth herein, do hereby, AWARD, as follows:

    Claimant's request for an award of attorney fees is granted, and Claimant is awarded attorney fees in the amount of $5,600.00. This award is in addition to those monetary amounts awarded in the Interim Award.

    This Final Award document includes and incorporates its attached Appendix to Final Award.

The administrative fees of the American Arbitration Association (AAA) totaling $1,900.00 shall be borne as incurred, and the compensation of the arbitrator totaling $2,500.00 shall be borne as incurred.

The above sums, again including those awarded in the Interim Award, are to be paid on or before ten (10) days from the date of this Award.

This Final Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

 

    10/31/22
    Date                                                             Edward F. Hennessey, Arbitrator

# APPENDIX TO FINAL AWARD IN *Alicia Adams v. Titlemax of South Carolina, Inc.* (AAA ref. no. 01-22-0000-1844)

This Appendix presents context for the Final Award in the above-referenced matter. The September 12, 2022 Order on Dispositive Motions and Interim Award of Arbitrator (the Order) left for resolution only "what attorney fee, if any, to award to Claimant under N.C. Gen. Stat. § 75-16.1." The Order did not invite re-argument of Claimant's entitlement to the relief awarded her in the Order.

1. *Respondent unwarrantedly refused fully to resolve this matter with Claimant:* In its October 18, 2022 Opposition to Claimant's Request for Attorney's Fees (the Opposition), Respondent effectively reargues entitlement. Its first argument in the Opposition is: (a) the Fourth Circuit "is more likely to follow [the] *Midwest Title* [decision of the Seventh Circuit]" than any authority that might cut against Respondent; (b) "*Midwest Title* mandates the conclusion that [Respondent] cannot be held liable on the factual allegations and claims presented by Claimant;" and (c) "[t]herefore, [Respondent] was well-warranted in choosing not to settle and instead proceeding with adjudication."

Respondent offers these points to defend its refusal to make any settlement offer to Claimant during the course of this arbitration, including after the parties' receipt of the Order.[1] Synthesizing these points from the arbitrator's perspective, their intended message is: an arbitrator who grasps the facts and law must rule for Respondent; any arbitral failure to do so would display error so gross as to force vacation of the arbitral award by the Fourth Circuit (if not earlier by the Middle District, with any failure to do so by that Court presumably displaying the same conspicuous error as an arbitral award for Claimant); this sequence of events being inevitable, no available rationale commended any effort by Respondent to settle with this Claimant.

As an initial observation and with regard to any point prior to the Order, assuming Respondent expected defense costs to exceed zero, the merits of even a nominal offer seem evident on a pure cost vs. benefit basis. Granting Respondent to be a rational actor applying cost/benefit analysis to the question whether settlement at some non-zero figure would be more beneficial to it than incurring defense costs through arbitral disposition, its decision to offer nothing implies that it viewed the benefit of arbitrating through Final Award to exceed its costs to do so. A rational commercial actor like Respondent might find such benefit in, for example, the implication that it will defend what it views as defensible business decisions, to support is implicated personnel or its business model more generally; to send a message to prospective claimants that filing a claim will not automatically provoke an offer;[2] or for other reasons.

But Respondent identifies only one reason accounting for its decision not to offer to settle with Claimant; because Respondent saw no chance an arbitrator analyzing the matter correctly could go Claimant's way, or that a federal court would fail to vacate if the arbitrator went that way regardless. Leaving aside both whether these convictions could have stood on solid footings if Claimant's was the first case of its kind to go the distance in arbitration, or the first award adverse to Respondent (or another car title lender defending the claim of a North Carolina borrower), the history of arbitral and judicial

---

[1] In her Request for Attorney's Fees, Claimant is express that Respondent has never offered anything to settle, at any point in the case. The Opposition does not address the subject in so many words. I infer from its argument that Claimant is accurate.

[2] Here, in a case representing one strand of a disaggregated class action, with counsel in common among multiple individual claimants, the "precedential" value of stout resistance by the common respondent might be, or be thought to be, more substantial than situations involving separate counsel pursuing similar claims. In those situations, the private quality of arbitration may make it more difficult for the common respondent effectively to communicate its no-settlement position so as to discourage new filings. Counsel handling multiple similar claims against the same respondent can presumably get a pretty clear idea of how it will respond to new ones.

Case Number: 01-22-0000-1844 2
15520057v2 26882.00010

Case 1:19-cv-00489-LCB-JLW    Document 205-1    Filed 11/02/22    Page 4 of 7

disposition of such claims, as that history stood and developed while this case proceeded, showed arbitrators and federal courts viewing the situation differently from Respondent. That history left Respondent's expressed reasons for refusing to offer settlement on increasingly shaky ground.

Respondent's footing in this case then got worse. By refusing to offer settlement even after the Order issued – that is, when one key feature of its thesis ("no arbitrator could go a claimant's way") had been disproven, leaving its path to a zero for Claimant dependent on judicial vacation – Respondent faced particular risks with Chapter 75[3] in play. N.C. Gen. Stat. § 75-16.1 defines "unwarranted refusal ... to fully resolve the matter which constitutes the basis of [a] suit [instituted by a person]" as the inquiry on which fee entitlement turns, once the adjudicator has determined liability to exist under Chapter 75.

The product of that inquiry here is that Respondent had no warrant to refuse at least to try fully to resolve Claimant's suit – **the** matter with **the** person involved in **this** ("such") suit. That determination extends from the date of this Final Award to the inception of this matter. Here, the statutory focus on "the matter" before the adjudicator renders irrelevant the possibility that Respondent may offer more broad spectrum risk management strategizing to explain its refusal to settle after the Order. Respondent might argue, for example, that discouraging inflated settlement expectations on the part of counsel or other commonly-represented claimants, even discouraging prospective claimants from pursuing claims, makes exposure to a fee award here worth it – even though offering the full amount awarded in the Order would at least have given Respondent a basis to resist at least part of a fee request (the part reflecting fees incurred after the offer was made and, in this hypothetical, rejected by Claimant). Or maybe it thought that regurgitating liability arguments the Order rejected might prompt an arbitral about face.

To be sure, Respondent has the right to decline to offer settlement, at any point, for any reason. In this case, involving this Claimant, which is the only frame of reference relevant under Chapter 75, exercising that right was not warranted.

2. *Comments on particular Respondent arguments:*

A. Respondent's contractual requirement of arbitration and class action waiver are inconsistent with its confidence in the invulnerability of its legal position:

Respondent makes what boils down to a *per se* argument: no North Carolina resident who travels to one of its offices in South Carolina and there[4] signs its form car title loan documents can "force North Carolina laws upon" Respondent. Opposition at 2. The *per se* label fits because, if the argument has traction, the circumstances the led the borrower to Respondent; Respondent's reliance on North Carolina law and administration to record its title lien; Respondent's declared and reserved prerogative to enter North Carolina to claim its security; the how, what and where of communications between Respondent and borrower – none of that would or indeed could matter. Respondent would have a slam-dunk legal position that any judge would comprehend, embrace and invoke to toss borrower claims asserted by invocation of North Carolina law.

But if Respondent had the faith in this *per se* argument that it has claimed in this and, one must infer, every other arbitration with a North Carolina borrower, its contract would, logically, foreswear arbitration and require borrowers to litigate. It would probably also embrace class action treatment.

---

[3] The North Carolina Unfair and Deceptive Trade Practices Act.
[4] There's more to "there" here than may be plain; see the next numbered discussion.

Case Number: 01-22-0000-1844

15520057v2 26882.00010

3

Judicial acceptance of a bulletproof legal position, particularly leveraged across a class, would be a vastly more efficient means of handling claims than myriad arbitrations.

Stated otherwise, by mandating arbitration and a class action waiver, Respondent has opted for a dispute resolution system that makes little sense for a would-be defendant/respondent confident its legal position is unassailable.

    *B.*    <u>Respondent's largely unexamined assertion that its contracts with North Carolina borrowers are made in South Carolina struggles on examination</u>:

Respondent declares South Carolina as "the place where the contract was made." The declaration may be flimsier than Respondent admits.

Both Claimant and Respondent signed the Loan Documents (defined as Respondent does in its filings) using DocuSign. The DocuSign legend appears against each signature on each Loan Document.

DocuSign is a proprietary cloud-based software platform used to effect "electronic signature" of documents. Both the Electronic Signatures in Global and National Commerce Act, commonly called the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, and South Carolina's version of the Uniform Electronic Transactions Act (SCUETA), S.C. Stat. Ann. § 26-6-20(8), are useful in unpacking "the place where the contract is made" considering use of DocuSign. DocuSign operates as an "electronic agent" under these statutes, and the Supervised Loan Agreement (the SLA) that Respondent offered Claimant, and that each signed via DocuSign, appears to count as an "electronic record" under the SCUETA. The SLA stating nothing to the contrary, SCUETA treats the SLA "[a]s considered to be sent from the sender's place of business and to be received at the recipient's place of business." *Id.* at 26-6-150(D)

It does not matter whether Claimant was "sender" or "recipient" in SCUETA parlance. Claimant had no "place of business," at least as relevant to the personal loan from Respondent at issue here. This means that the SLA was "considered to be sent from" Respondent's place in South Carolina to Claimant's residence in North Carolina. *Id.* at 26-6-150(D)(2).

In other words, under the SCUETA, when the last of Claimant and Respondent DocuSigned the SLA, the effect was to create an agreement deemed created between a party in South Carolina with one in (for E-Sign and SCUETA purposes) North Carolina. It appears on that basis that the SLA was formed as to Claimant in North Carolina, her state of residence, and further that Claimant's "acceptance" and "signing of documents" occurred in North Carolina. N.C. Gen. Stat. § 53-190(a).

There is nothing weird about any of that, because while Respondent could presumably have created the SLA via "wet" signatures – manuscript signatures of each party supplied in South Carolina – it chose to use DocuSign. Claimant either typed her name on a keyboard or used a stylus to sign her name on a touchscreen. Cloud-based software running on one or more servers (none in South Carolina, at least as far as the record here suggests) digitized the information thus transmitted, translated it into the "signatures" that appear on the SLA and produced the completed SLA found in the record.

Whether the sequence was as in-the-moment for Respondent – meaning an authorized representative of Respondent, physically present with Claimant when Claimant interacted with DocuSign, acted to generate a signature specific to the loan to Claimant - or whether DocuSign had recourse to previously-furnished and digitally stored information of an authorized representative of Respondent that it

could affix is unclear, but also not evidently relevant. Respondent clearly had a "place of business" in South Carolina however it came to sign the SLA.

In other words, while Claimant, by the evidence, interacted with DocuSign while at Respondent's office in South Carolina, she could as easily have done so in North Carolina or at any point on the globe from which she could accessed cloud-based software. Which begs the question – why did Respondent require Claimant to travel from North Carolina to South Carolina? Respondent may say "because we had to inspect and assign a value to her car, to help determine whether and how much to offer in loan." That makes some sense, although of course Respondent could also have gone to North Carolina to check out the car, as it would do if it sought to repossess it on loan default.

But even if Respondent had to have someone physically inspect Claimant's car as a predicate to a loan offer, and even if Respondent preferred the inspection to occur in South Carolina, once it approved a loan offer and conveyed it in the form of an SLA, Claimant could have accepted the offer via DocuSign signature on the SLA from anywhere. And if Respondent's purpose as far as requiring Claimant to appear in South Carolina was in part to build a position for its SLA as executed "in" South Carolina, using DocuSign not only makes no sense, but defeats the purpose, boomeranging Claimant's signature back across state lines as a matter of South Carolina law – the law Respondent insists should control on everything.

3. *Respondent willfully engaged in each act and practice on which the determination of its liability in this matter rests:* The bases for this finding should by now be apparent. Respondent made to multiple borrowers it knew to be North Carolina residents, against motor vehicle security likewise resident in and security interests over which must be perfected in North Carolina, loans on terms it acknowledges violate North Carolina law, Claimant's among them. These are not the only facts evidencing willfulness, and are featured here only to confirm the arbitrator carefully considered the "willfulness" element of N.C. Gen. Stat. § 75-16.1.

4. *The fee amount Claimant requests is reasonable in all relevant respects:* As a matter of fact, and in the fullest exercise of the discretion permitted in respect of a request for fees under Chapter 75 of the North Carolina General Statutes, the fees sought by Claimant are reasonable in amount, reasonably documented and attested, and reflect no shortcoming in substantiation (by form or content of document or otherwise) requiring the denial or diminution of the full amount ($5,600.00) Claimant requests.

5. *Affirmation regarding scope and depth of arbitral consideration and analysis:* Where the Order or Final Award disagrees with any Respondent argument on a legal point, the Order or Final Award reflects the arbitrator's best interpretation of the relevant law and, where the disagreement reflects an application of law to facts, of the proper outcome of such application. The arbitrator has given careful and serious attention to each legal and factual argument and assertion presented by each of the parties, and, as this Appendix was drafted partly to illustrate, more broadly to the legal authority and conceptual arguments (*e.g.* where the SLA was or could be viewed as having "been made") the parties have offered.