IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| AARON GOINS et al., ) <br> ) <br>     Plaintiffs/Counter Defendants, ) <br> ) <br> v. ) <br> ) <br> TITLEMAX OF VIRGINIA, et al., ) <br> ) <br>     Defendants/Counter Claimants. ) | Civil Action No. 19-cv-489 |

## JARRAD COXE'S REPLY TO OPPOSITION TO MOTION TO ENFORCE AWARD

TitleMax again attempts to relitigate the case here despite the fact that JAMS Arbitrator Terrence Croft conducted a merits hearing and decided the matter in Plaintiff's favor. The five (5) day merits hearing was June 27-July 2, 2022, where he heard sworn testimony from nineteen (19) witnesses for both sides. (Exhibit A). TitleMax's opposition claims that there was no hearing and that Arbitrator Croft issued his Award "solely on the dispositive submissions."[1] Arbitrator Croft evaluated the credibility of the Plaintiff as well as all of the witnesses called by TitleMax. It now asks this Court to find that Arbitrator Croft acted with manifest disregard for the law despite hearing the witnesses.

---

[1] This misrepresentation is likely because TitleMax fired all of its law firms again and so the lawyers who signed this opposition were not involved for the hearing. Still, the Court granted TitleMax an extension to file this opposition. The statements made throughout TitleMax's opposition here are simply not accurate—largely because the signers apparently never even bothered to speak with TitleMax's counsel (and still counsel of record, William Farley of Troutman Pepper) who actually took these cases to this five day full evidentiary hearing. TitleMax hired a court reporter for the hearing but chooses now not to put in the transcript or acknowledge that it even occurred.

1

This Court in this very matter has repeatedly rejected the efforts TitleMax makes here to unwind the entire purpose of arbitration. Dkt. 151 at page 3 (J. Biggs in *Sells* matter, August 26, 2021)(enforcing the exact same trebling under Unfair & Deceptive statute for violations of the North Carolina Consumer Finance Act. ("CFA")). Every North Carolina Superior Court Judge who has heard these matters have ruled against other car title loan providers. And now the North Carolina Court of Appeals has as well in the *AutoMoney* cases (DR 169). TitleMax's position is that everyone – North Carolina Judges, the North Carolina Court of Appeals, and dozens of arbitrators are all just wrong. And not just wrong but manifestly wrong.

## I. THE ARBITRATOR'S DAMAGES CALCULATION AND STATUTE OF LIMITATIONS DETERMINATION IS CORRECT

TitleMax maintains that Plaintiff cannot recover treble damages for the amount that is awarded for a violation of the CFA. There is no support for the contention that CFA precludes trebling under Chapter 75. As outlined more completely in Margie Weavil's reply (DR 272),

Further, because the North Carolina Consumer Finance Act makes "retaining" Plaintiff's money and property (car) a separate tort, the Statute of Limitations is not applicable to this as explained in Arbitrator Croft's Interim Award:

> Most of the loans are clearly within the statute of limitations, even if the date of the loan was used. However, N.C.G.S. 53-166(d) makes it a violation to collect, receive or retain any principal or charges whatsoever with respect to the loan. Respondents have never paid back the funds they obtained from these Claimants, and thus Respondents retain those funds and the tortious conduct continues and the violative acts have not ceased and the statute of limitations has not run on any claim.

Croft Interim Award at 2. (D.R. 237, Exhibit 1)[2]

TitleMax's argument that these tort claims begun to run before the torts are ever committed—at contract formation—based on the District Court in *Faircloth* is troubling, particularly since the Fourth Circuit literally overruled the District Court on the issue. *Faircloth* was actually a case where all of the illegal fees were actually rolled into the loan up front. The Fourth Circuit opinion in *Faircloth* actually outright says "fees of the type that *Faircloth* paid here are simply not analogous to interest, even where they are rolled into the underlying loan. Whereas the obligation to pay interest is discharged over the course of the loan repayment period in accordance with the terms of the lending agreement, the obligation to pay closing costs is fully discharged at closing." *Faircloth v. Nat'l Home Loan Corp.*, 87 F.App.'x 314, 319 (4th Cir. 2004). The opposite is true here—these matters are predatory interest cases extending into the future with the amount of interest to be charged unknown altogether at closing—given the early repayment nature of these loans. The *Faircloth* case actually supports Plaintiff. Thus, TitleMax's best result would be that all payments made before April 2, 2015 (four years prior to filing) are excluded.

However, Claimant argued, and Arbitrator Croft agreed, that the statute of limitations on Claimant's claims under Ch. 53 and Ch. 75 does not begin to run until the violations <u>cease</u> under this particular North Carolina statue. Respondent continues to violate N.C. Gen. Stat. § 53-166(d) (and therefore Chapter 75) by retaining all of Claimant's payments. The continuing wrong doctrine provides an exception to the general rule that a cause of action accrues as soon as the right to institute and maintain a suit arises. "When this doctrine applies, a statute of limitations does

---

[2] Claimant's Closing Arguments to Arbitrator Croft, along with the Exhibits are attached as Exhibit B and C.

not begin to run until the violative act ceases." *Petruzzo v. HealthExtras, Inc.* 124, F.Supp3d 642 (E.D.N.C. 2013) (quotations omitted). *See also, Williams v. Blue Cross Blue Shield of NC*, 581 S.E.2d 415, 357 N.C. 170 (N.C. 2003) (These two attached as Exhibit B)

N.C. Gen. Stat. § 53-166(d) makes it a violation of the NCCFA to "collect, receive, **_or retain_** any principal or charges whatsoever with respect to the loan." The retention of the payment is a separate and distinct violation of North Carolina law. Respondent's retention of Claimants' payments on the loans continues to this day. The continuing wrong doctrine is expressly codified in Chapter 75 of the North Carolina General Statutes. N.C. Gen. Stat. § 75-8 provides: "Where the things prohibited in this Chapter are continuous, then in such event, after the first violation of any of the provisions hereof, each week that the violation of such provision shall continue shall be a separate offense." Here, the Chapter 75 violation is the collection, receipt **_or retention_** of Claimant's payments. The legislature chose to specifically make retention of the payment a separate violation. Finally, because of all the cross marketing through the years of past customers, the facts of these cases establish one continuous course of conduct constituting the basis for these claims under 53-190.

## II. ARBITRATOR CROFT'S REJECTION OF THE COMMERCE CLAUSE DEFENSE WAS NOT A MANIFEST DISREGARD OF THE LAW. IT WAS ACTUALLY CORRECT

TitleMax itself has taken its commerce clause defense all the way to SCOTUS. It lost. Yet now it contends arbitrators are manifestly disregarding the law by also rejecting it. This "principle against extraterritoriality" is born of the notion that "a State may not regulate commerce occurring wholly outside of its borders." *Healy v, Beer Inst*., 491 U.S. 324, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)(emphasis added). The reality is TitleMax's conduct was simply not wholly outside North Carolina.

4

In determining whether a state statute violates the Dormant Commerce Clause, the courts conduct a two-tiered analysis. *Environmental Technology Council v. Sierra Club*, 98 F.3d 774 (4th Cir. 1996). When a state statute directly regulates or discriminates against interstate commerce, or when the effect is to favor in-state economic interests over out-of-state interests, the statute can be struck down. *Brown-Foreman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L. Ed. 2d 552 (1986.) The statute does not dictate what interest rates Defendant may charge its borrowers in other states nor does it require Defendant to lend in other states at the rates of interest required by North Carolina law. Rather, the CFA governs Defendant's loans *only* when Defendant chooses to enter into the State of North Carolina for the purpose of engaging in conduct and activities that further its lending business. Furthermore, N.C.G.S. §53-190 does not discriminate in favor of North Carolina car title loan lenders and against Defendant. Domestic lenders are not permitted to charge higher rates of interest than Defendant.

The Business Court in *Western Sky* rejected a defense challenge that N.C.G.S. §53-164, *et seq.*, violated the dormant Commerce Clause holding that "[t]he statutes at issue do not attempt to regulate conduct beyond North Carolina's borders and do not unduly burden interstate commerce." The Court further observed that "[t]he statutes do not purport to dictate the interest rates or other lending practices that Defendants apply in any state other than North Carolina." The Court concluded, after engaging in a balancing analysis pursuant to *Brown-Foreman*, that "the State's application of the relevant statutes to the loans at issue does not violate the dormant Commerce Clause."

5

TitleMax cites a Seventh Circuit opinion—*Midwest Title Loans*— for its argument that the applicable North Carolina laws are unconstitutional and claims the case is on "all fours." *Midwest Title Loans* addresses the authority of the State of Indiana to force a title lender to register to conduct business in Indiana. It does not address, and expressly distinguishes, the question of whether Indiana law would apply to a consumer loan transaction with a Hoosier in an Indiana Court. The Court observed:

> Midwest has yet to sue any of its title borrowers. But if there were a suit, an Indiana court might rule that Indiana had the "most intimate contacts" with the transaction and therefore that its law applied even though the loan had been made in Illinois. Or it might rule that Illinois's failure to limit the interest rates in title loans was so offensive to the public policy of Indiana that the Illinois law would not be enforced in Indiana – in which event the Indiana courts might refuse to apply Illinois law even if Midwest's contracts contained a choice of law clause directing that Illinois govern a suit arising from the contract – which they do. In short, a particular set of facts giving rise to litigation [can] justify, constitutionally [that is, under the due process clause] the application of more than one jurisdiction's laws.

*Id*. at 668 (internal citations omitted). Not only is Midwest Tile not "on all fours" with this matter—it actually directly says that it is not.

**Weissmann v. TitleMax.**

TitleMax has already litigated this defense to conclusion. On January 24, 2022, the Third Circuit expressly rejected a challenge by TitleMax to the application of an identical Pennsylvania law to title loan transactions between Pennsylvania residents consummated at TitleMax locations in neighboring states. *TitleMax of Delaware v. Weissmann*, 24 F.4th 230 (3rd Cir. 2022). TitleMax frantically appealed to the US Supreme Court. SCOTUS also chose to reject their efforts and denied their petition for a writ of certioriari. *Weissmann*, 597 US __, June 27, 2022). Pennsylvania, like

6

North Carolina, does not permit high interest consumer loans. "In this case, we are required to determine whether applying Pennsylvania usury laws to an out-of-state lender violates the dormant Commerce Clause. We conclude that it does not." *TitleMax of Del., Inc. v. Weissmann* (3rd Cir. 2022).

*Weissman* is indistinguishable. In *Weissman*, TitleMax made loans to Pennsylvania residents from loan-making offices outside of Pennsylvania. TitleMax secured the loans with liens on borrower's vehicle titles which it perfected using the Pennsylvania DOT. *Id.* TitleMax accepted payments on its loans from Pennsylvania by phone in Pennsylvania. *Id.* TitleMax sent collection letters and made collection calls into Pennsylvania. *Id.* For the purposes of its decision that Pennsylvania law applied, the Third Circuit even accepted TitleMax's contentions that:

> TitleMax does not have any offices, employees, agents, or brick-and-mortar stores in Pennsylvania and is not licensed as a lender in the Commonwealth. TitleMax claims that it has never used employees or agents to solicit Pennsylvania business, and it does not run television ads within Pennsylvania, but its advertisements may reach Pennsylvania residents… *Id.*

Given these activities, the Court rejected TitleMax's contention. The Court wrote:

> TitleMax's transactions involve more than a simple conveyance of money at a brick-and-mortar store in a location beyond Pennsylvania's border. Rather, the loan creates a creditor-debtor relationship that imposes obligations on both the borrower and lender until the debt is fully paid. For instance, Pennsylvanians with TitleMax loans made payments to TitleMax while physically present in the state…TitleMax's loan agreements grant TitleMax a security interest in the Motor Vehicle, which in the case of a Pennsylvania borrower is a Pennsylvania-registered automobile. TitleMax records these liens with PennDOT and may repossess the vehicle if the consumer defaults

7

on his loan. Thus, by extending loans to Pennsylvanians, TitleMax takes an interest in property located and operated in Pennsylvania.

*TitleMax of Del., Inc. v. Weissmann* (3rd Cir. 2022), 12-13 (internal citations and quotation omitted).

Further, in rejecting TitleMax's Commerce Clause defense, the Third Circuit distinguished loan transactions from sales transactions, such as *Carolina Trucks* on which Respondent relies. "These aspects of loan servicing make TitleMax's conduct different from that in the *Healy* line of cases, which largely involved transactions in goods that ended at the point of sale." *Id*. at 13 (distinguishing sales cases, including th 4th Circuit case *Carolina Trucks)* The Court concluded:

> Unlike the sale of a good, a TitleMax loan has a longer lifespan: it involves later payments and permits a physical taking (repossession) from inside another state. Because TitleMax both receives payment from within Pennsylvania and maintains a security interest in vehicles located in Pennsylvania that it can act upon, its conduct is not "wholly outside" of Pennsylvania. For these reasons, applying the Pennsylvania statutes to TitleMax does not violate the extraterritoriality principle…

*Id*. at 13-15.

Yet, TitleMax now contends the 4th Circuit provided binding precedent to the matter here with *Carolina Trucks*—despite the reality that transaction of goods that end at the point of sale cases are very different than the ongoing debtor/creditor relationship present here. Having concluded that TitleMax's title loan transactions with Pennsylvania borrowers are not wholly extraterritorial, the Third Circuit next turned to "whether the burdens from the state law being applied on interstate commerce substantially outweigh the putative local benefits." *Id*. at 16. The Court concluded because "the laws do not

8

discriminate between in-staters and out-of-staters, the inquiry as to the burden on interstate commerce should end and further analysis of the local benefits is unnecessary." *Id*. at 17. The Court further found even weighing the local benefit to the burden on interstate commerce would not invalidate the application of Pennsylvania law, concluding:

> Pennsylvania has a strong interest in prohibiting usury. Applying Pennsylvania's usury laws to TitleMax's loans furthers that interest, and any burden on interstate commerce from doing so is, at most, incidental. Pennsylvania may therefore investigate and apply its usury laws to TitleMax without violating the Commerce Clause.
>
> *Id*. at 18

Similarly, North Carolina has a strong public policy preventing usury. Respondent's Commerce clause defense was properly rejected. It was certainly not a "manifest disregard" and the Court system ought not be evalutating arbitration awards de novo. Doing so would eliminate the purpose of arbitration altogether.[34]

### III. This Court Should Award Attorneys' Fees Resulting from this Challenge to the Arbitrators' Award so that this Delay Conduct is not Rewarded.

---

[3] TitleMax also mentions in a footnote that Croft did not "properly consider the choice of law provision in the operative loan agreement." Croft, of course, did not need to explain in his award his rejection of every single argument TitleMax made. However, his award actually did reject that exact argument: "North Carolina law is clear that choice of law provisions which purport to allow lenders to evade North Carolina usury laws violate public policy and North Carolina will not enforce such choice of law provisions. A bevy of North Carolina decisions decided on July 19, 2022 support this conclusion." Interim Award 4 at page 1.

[4] TitleMax also raised their purported release. Coxe testified that he never signed it. See Exhibit F. TitleMax put on no evidence to rebut his testimony. Ms. Funderburk was nowhere to be found and, unlike her submitted Affidavit, Mr. Coxe's testimony was subject to cross examination. Arbitrator Croft clearly found him credible and discarded the purported release.

9

Further, both the North Carolina's Revised Uniform Arbitration Act, N.C. Gen. Stat. § 1-569.25(c) and, in addition, the court's inherent authority to allow for an award of attorneys' fees. *See International Chemical Workers Union v. BASF Wyandotte Corp.*, 774 F.2d 43, 47 (2d Cir. 1985). This matter has gone on far too long and - even after losing before so many Arbitrators - Titlemax continues to unjustifiably refuse to pay. The Court should award Plaintiff attorneys' fees as it has in the past and should likewise consider more fees on remand if TitleMax appeals again. A Declaration in support thereof is attached as Exhibit D. TitleMax, finally, does not even challenge Arbitrator Croft's award of attorneys' fees or that the North Carolina Consumer Finance Act applies to the matter.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order confirming the Award of Arbitrator, entering judgment (with interest from the date of the Award) against TitleMax of Virginia, Inc. and awarding Plaintiff additional attorneys' fees for time spent enforcing the Arbitration Award. A proposed Judgment is being submitted herewith as Exhibit E.

This is the 13th day of January, 2023.

                                            */s/ Andrew H. Brown*
                                            Andrew H. Brown
                                            N.C. State Bar No. 28450
                                            Attorney for Plaintiffs

**FOR THE FIRM:**
**BROWN, FAUCHER, PERALDO & BENSON, PLLC**.

822 North Elm Street, Suite 200
Greensboro, NC  27401
(336) 478-6000 (telephone)
(336) 273-5597 (facsimile)
drew@greensborolawcenter.com

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing document complies with the word count limits contained in LR 7.3(d)(1).

*/s/ Andrew H. Brown*
Andrew H. Brown
N.C. State Bar No. 28450
Attorney for Plaintiffs

**FOR THE FIRM:**

**BROWN, FAUCHER, PERALDO & BENSON, PLLC**.
822 North Elm Street, Suite 200
Greensboro, NC  27401
(336) 458-0058 (telephone)
(336) 273-5597 (facsimile)
drew@greensborolawcenter.com

11