AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-22-0000-1847

Melissah Scales ("Claimant"),
-vs-
Titlemax of Virginia, Inc. ("Respondent")

Collectively ("Parties").

## INTERIM AWARD OF ARBITRATOR

    I, Dailey J Derr, the Undersigned Arbitrator ("Arbitrator"), having been designated in accordance with the arbitration agreement entered into between the Parties and Claimant's statutory claims having been filed in North Carolina Superior Court and removed to the Middle District of North Carolina with that Court sending the entire dispute to arbitration for the Arbitrator to decide the case as if sitting as the Judge and Jury in the Middle District of North Carolina applying North Carolina law including the determination of choice of law rules. The Arbitrator having received post Preliminary Management Hearing and Scheduling Order submissions of the Parties through counsel of cross dispositive motions supported by memorandum,[1] having been duly sworn, having duly heard the allegations and proofs, of the Parties, represented by Drew Brown of Brown, Faucher, Peraldo & Benson, PLLC for the Claimant and William J. Farley, III of Troutman Pepper Hamilton Sanders LLP for the Respondent, via a Zoom evidentiary hearing held on October 06, 2022, having heard testimony from Claimant and Newell Spears for the Claimant and Jose Urbaez Otto and Billy Walkowiak for the Respondent, and having considered the Parties' oral arguments, briefs, including reply briefs, and cases cited by the Parties do hereby issue this Interim Award of Arbitrator, as follows:

---

[1] Ruling on these motions was deferred. However, they were read, digested, assessed, and considered in preparing for the evidentiary hearing and in preparing this interim award.

# RELEVENT FACTS

Claimant at all times relevant to this matter was a resident of Guilford County, North Carolina ("Residence"). Upon the recommendation of a North Carolina friend, who told her about title loans provided by Respondent, Claimant called from her home in North Carolina to an office operated by Respondent in Danville, Virginia ("Danville Office") to inquire about obtaining a loan secured by a motor vehicle owned by a North Carolina resident. The Respondent's employee in the Danville Office ("Employee") told her Respondent does give loans to North Carolina residents. Claimant's vehicle was a 2008 Chevrolet Impala VIN # 2G1WT58K189175789 ("Vehicle").

They discussed an amount on the phone and he said he anticipated she could get about $1500 based on her description of the Vehicle. The Employee told her while she was in North Carolina she should come to Danville, Virginia, and bring with her the Vehicle, the North Carolina Vehicle title, her driver's license, and proof of North Carolina residence after which Respondent would advise the amount of the loan she could receive. The Employee sold Claimant on the belief if she came up there with all of this, which she knew she had, she would get a loan. Because of that Claimant drove from her Residence to the Danville Office bringing the documents the Employee had requested.

On November 27, 2015, Claimant obtained a car title loan from Respondent in the amount of $2,715.00 at an interest rate 143.94 % with total payments due of $8,368.69 and entered into a Federal Truth-in-Lending Disclosures and Consumer Finance Loan with Respondent concluding the Virginia portion of the loan process ("Loan"). Claimant signed all documentation presented to her by Respondent which included documentation upon which Respondent could obtain a lien on the Vehicle in North Carolina. Nothing was notarized in the presence of Claimant while she was in the Danville Office. Thereafter, the lien document securing the loan transaction was perfected by recordation in the office of the North Carolina Division of Motor Vehicles located in Raleigh, North Carolina.

Respondent telephoned Claimant in North Carolina to try to collect payments, sent her letters to the Residence from the Danville Office trying to collect payments, and sent texts messages into North Carolina trying to collect payments. The lien document securing the loan transaction was perfected by recordation in the office of the North Carolina Division of Motor Vehicles located in Raleigh, North Carolina.

On January 18, 2017, Unlimited Asset Recovery LLC, agent of Respondent, repossessed the Vehicle at the Residence during the night.

Claimant's fair market value witness testified the fair market value of the Vehicle at the time of repossession was $5,500.00. Respondent's fair market value witness testified the fair market value of the Vehicle at the time of repossession was $3,685.00.

Claimant testified the Vehicle had mileage of 176,000, was working perfectly fine, and had good tires.

# ISSUES

1. Did Respondent violate provisions of the North Carolina Consumer Finance Act, to wit, the provisions of the statute that relate to "Loans Made Elsewhere," N.C. Sen. Stat. 53-190(a) and (b) when it entered into a motor vehicle title loan with Claimant?

2

2. Did Respondent violate the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. 75-1.1 when it entered into the subject motor vehicle title loan with Claimant?

3. If Respondent violated either or both of the alleged North Carolina statutes, what are the damages?

**Issue 1**

N.C. Gen. Stat. 53-190(a) states the following:

> No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges that are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or reviewed shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiations, offer, acceptance, signing of documents and delivery and receipt of funds, occur entirely outside North Carolina.

The first sentence of this statute prohibits the enforcement of a loan contract made outside the State equaling $15,000 or less that charges or contracts for or provides for consideration received that exceeds what is allowed, i.e., (in this case) 30% interest. (See N.C. Gen. Stat 53-176(a)(1) specifying loans less than or equal to $4,000 can collect 30% interest per annum). The second sentence nullifies the first sentence's prohibition if entirely all contractual activities occur outside the State which is to say that if any contractual activities associated with such a loan do occur within the state, then the loan may not be enforced.

What the legislature intended by the language of this paragraph can be debated. The examples of conduct identified in the second sentence all sound like contract formation-type activities, but the words of the statute speak of "all contractual activities" without stating any restrictions on whether it intends to regulate only formation activities or also post formation activities. The more reasonable interpretation of the statutory language in question is to acknowledge the sweeping nature of the term "all," to include both formation and post-formation activities.

The statutory language also leaves open the interpretation of the phrase, "occur entirely outside North Carolina." One question that arises is whether a discussion between a lender physically out-of-state and a prospective borrower physically within North Carolina is a discussion occurring entirely outside or inside North Carolina. From the lender's perspective the discussion is entirely from outside the-state. From the borrower's perspective the discussion is entirely in-state. The fact that one party to a discussion is physically inside the state excludes the possibility that the discussion could be considered entirely outside-the-state. The more reasonable reading of the phrase, "occur entirely outside North Carolina" is to prohibit all contact between a borrower and a lender for an amount falling within the parameters of the statute unless both parties are physically outside North Carolina at all times for all contractual activities.

In this case, Employee is in the Danville Office having a discussion with Claimant while Claimant was in North Carolina during which Claimant told Employee that she wanted a loan. Employee asked Claimant questions concerning the make and model of the Vehicle and whether she had the title to the Vehicle. Employee explained that Claimant would have to bring the Vehicle to the Danville Office with the title and that when she did so, the Vehicle could be inspected and evaluated before Respondent could give her the loan. Based on their discussion, Claimant developed confidence that if she did what the agent said, she would be able to get the loan she wanted. Soon thereafter, Claimant drove to the Danville Office where she was able to obtain the loan without complications.

3

The statute specifically lists "contractual activities," if they occur in North Carolina, that would prohibit enforcing such a contract. One of the activities listed is "discussion." Another example is "negotiation." Whether Claimant and Respondent engaged in negotiation might be debated, although from this Arbitrator's perspective, negotiation in its earliest stages did occur in North Carolina because Respondent convinced Claimant to leave North Carolina to come to the Danville Office. Whether the parties engaged in "discussion" while Claimant was in North Carolina was proven though because they talked about what documents—the title—and property—the Vehicle— Employee would need to see, as well as what the make and model of the Vehicle was and the amount she wanted to borrow. The conversation establishes that the parties had a substantive *discussion* about the prospective loan. Whether the parties could have had less of a conversation that did not become a "discussion" is a question that does not have to be addressed. The conversation that occurred was more than enough to show that the statute's prohibited "discussion" occurred, and it brought the lender within the regulated umbrella of the statute's first sentence.

Claimant highlights that the discussion that she had with Employee occurred before she signed the contract with TitleMax. The contract contains choice of law provisions that proscribe the application of law other than North Carolina's. The Respondent should not be allowed to escape responsibility under North Carolina law for its prior conduct of engaging in discussion with Claimant by choosing law that would permit the conduct prohibited by North Carolina.

Respondent argues that the statute speaks in terms of *enforcement* as to suggest that the North Carolina legislators intended this paragraph only to allow actions by lenders against borrowers if and only if entirely all contractual activities occurred outside of the state. Respondent's interpretation also limits the application of the paragraph to actions based on only contract formation activities as opposed to post-contract activities such as receipt of payments of collection efforts. Yet enforcement action of any kind necessarily is post-contractual. While the paragraph can be read to be only a shield for lenders if all contract formation activities occur entirely outside North Carolina, there are no words appearing in the paragraph that restrict a borrower from instituting an action of his or her own against the lender based on contract formation or post-contact activities. Hence, Claimant filed suit herself under this statute.

Respondent violated Section 53-190(a). It is established that the parties entered into a contract, Loan. It is also established that the interest rate charged the Claimant was, at it appears on the first page of the Loan, 143.94 % per annum, and clearly exceeds the statutory rate maximum of 30% provided specifically in N.C. Gen. Stat. 53-176(a)(1). The Respondent does not qualify for the hold harmless provision found in the second sentence of the paragraph because it engaged in discussion about the Loan, if not early negotiation, as well, while the Claimant was in North Carolina.

N.C. Gen. Stat 53-190(b) states the following:

> If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article.

This paragraph addresses expressly a lender coming into North Carolina to either "solicit or otherwise conduct activities in regard to such loan contracts." The activities in regard to such contracts are not defined, but the paragraph regulates the lender's conduct as being "subject to the requirements of the Article." Compared to paragraph (a), paragraph (b) appears to cover the lender's conduct more broadly in that it refers to "activities *in regard to such loan contracts*" (emphasis added), and it makes no attempt to

4

list any examples of prohibited conduct by lenders. In that case, (b) appears to expand the coverage of N.C. Gen. Stat 53-190.

Did Respondent come to the State to "solicit" loan contracts? The evidence submitted at the hearing did not establish that Respondent solicited Claimant. First, Claimant initiated the telephone call to Respondent's Danville Office. Second, there was no reported conduct by Employee to suggest that it tried to, for example, tell Claimant what a good deal she could get by doing business with Respondent, or that she could not find a better, quicker, or easier deal. Any of these suggestions could be construed to be a solicitation of Claimant, and no evidence of such statements or anything like them was admitted at the hearing. Thus, there was no solicitation by Respondent.

What *was* a substantive engagement and constituted coming into the State was Respondent's sending of its lien application into the North Carolina Division of Motor Vehicles office to record its lien. This action constituted an "activity in regard to such loan contracts." Through this action Respondent strengthened its claim to Claimant's motor vehicle in the event that she ever defaulted on her loan obligations. This was a voluntary coming into the State to gain the benefit of perfecting its security interest and is sufficient in and of itself to find that Respondent violated N.C. Gen. Stat. 53-190(b).

Which State's Law Applies?

Respondent argues against the application of North Carolina law to this dispute. It contends that the terms of the Loan that Claimant signed in the Danville Office expressly declared that Virginia law should govern the Loan. As previously noted, Respondent engaged in prohibited conduct before Claimant left North Carolina to go to the Danville Office to enter into the Loan. To allow the Respondent to escape its responsibility for its previous conduct by sanitizing its acts with a choice of provision is inappropriate. Further, to then rely on the choice of law provision or, as Respondent asserts, the *lex loci contractus* doctrine alternatively, to escape responsibility for violating N.C. Gen. Stat. 53-190 (a) and (b) is also inappropriate.

Respondent contends that if for whatever reason the choice of law term of the contract is not applied, then the fact that the contract was signed in Virginia should prevent the application of North Carolina law. It asserts that the principle of *lex loci contractus* should apply in that the last act that established the Loan occurred in Virginia, therefore Virginia law should control. On the other hand, Claimant argues that the law cited by the North Carolina Business Court in *State ex rel. Cooper v Western Sky Financial LLC*, 2015 NCBC 84, 2015 (Aug. 27, 2015) should control. *Cooper* notes that "North Carolina will not enforce a choice of law provision in a contract where the chosen law would "violate a fundamental policy of [North Carolina] of otherwise applicable law." (Citing *Behr v. Behr*, 46 N.C. App. 694, 695 (1980).

In opinions released this past summer, the North Carolina Court of Appeals confirmed that these choice of law and forum selection clauses are unenforceable in North Carolina's state and federal Courts. *Wall, et.al. v. AutoMoney, Inc.* (22-NCCOA-498, July 19,2022) and *Troublefield v. AutoMoney, Inc.* (22-NCCOA-497, July 19,2022). The Court decided the merits of the choice of law dispute in favor of the North Carolina resident consumer. These decisions are now the applicable and controlling law in North Carolina. The Middle District of North Carolina in this diversity action will "apply the choice of law rules enforced by the courts of the state in which it sits." *Sasser v. Safe Homes Security, Inc.* 18CV746, *4 (MDNC 2019), citing *Volvo Const. Equip. of N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581 (4th Cir. 2004).

5

If the state supreme court has not decided a question, "then we must apply what we ...find to be the state law after giving 'proper regard' to the relevant rulings of other courts of the state." *Phipps v. Robinson*, 858 F, 2d 965, 968 (4th Cir. 1988).

The *AutoMoney* line of cases that considered the effect of the choice of law provision in this precise context and makes clear the choice of law provision is void as against North Carolina public policy when contractual activity occurs in North Carolina. The only action that incurred in Virginia was receipt of the borrowed funds and signing the Loan.

"By discussing its business and the terms of contract by phone with North Carolina residents. Defendant discussed and negotiated loans within North Carolina as defined in N.C. Gen. Stat. 53-190. Therefore, we conclude Defendant violated N.C. Gen Stat. 53-190." *Troublefield*, at 23-25.

"Defendant has conducted contractual activities within this state, rendering the NCFA applicable. For example, Plaintiffs allege Defendant solicited, discussed, and negotiated the terms of the Loan, used the DMV to protect their security interest, and repossessed cars in North Carolina." *Wall* at 18.

It is clear from the recent *AutoMoney* decisions that N.C. Gen. Stat. Sec. 53-190 is a fundamental public policy and renders any contrary choice of law provision void.

North Carolina's policy regarding interest charged to borrowers is stated expressly in N.C. Sen. Stat. 24-2(g): "It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." The provisions of N.C. Gen. Stat. 53-176 limit the interest that can be charged to 30%. As noted previously, the interest charged Claimant exceeded by five times the maximum chargeable under North Carolina law. Charging such an interest rate violates a fundamental public policy of North Carolina as established in the cited Consumer Finance Act which invalidates the application of Virginia law by either choice of law provision or by *lex loci contractus*.

The remedy for a violation of the North Carolina Consumer Finance Act (either (a) or (b)) is set forth in N.C.G.S. § 53-166(d) which provides for compensatory relief and states that loans that violate the Act "shall be void and the licensee or any other party in violation shall have no right to collect, receive or retain any principal whatsoever with respect to such loan." Accordingly, Claimant seeks compensatory damages for the amount of the fair market value of her Vehicle at the time it was taken.

The Commerce Clause

TitleMax cites a Seventh Circuit option that arose when another motor vehicle title lending company sued that state of Indiana over Indiana' attempt to control title lending to its residents. *Midwest Title Loans, Inc. v. David H. Mills, Director of the Indiana Department of Financial Institutions* 593 F.3d 660 (7th Cir. 2010). In that case, Indiana defended itself from a suit to enjoin the application of an Indiana law that attempted to regulate loans made to Indiana residents from Midwest stores that were outside Indiana based on Midwest having advertised or solicited loans in Indiana. The Seventh Circuit affirmed a district court ruling that granted injunctive relief to Midwest and founded its ruling on the Commerce Clause of the United State Constitution.

In the Midwest case, Indiana's statute attempted to regulate out of state lenders like Midwest even though the only connection Indiana could claim with Midwest was its advertising in Indiana or its solicitation of its residents, i.e., its commercial speech. In the case at hand, North Carolina law regulates TitleMax on the basis of whether it engages in "contractual activities" with its borrowers in North Carolina and/or whether

6

it comes into the State to "otherwise to conduct activities" regarding loan contracts. This regulatory framework is different from what Indiana attempted to do with its regulation that prompted the Midwest suit. In the case at hand, as noted above, TitleMax conducted activities in the state via the discussion it had with Claimant while she was in the state and when it communicated directly with the North Carolina Division of Motor Vehicles regarding the perfection of its security interest. These activities are distinguished from the advertising that Midwest did in Indiana. Thus, the applicability of the Midwest case is of limited value to the analysis of this case, not to mention that a Seventh Circuit opinion is not controlling in this circuit.

The case cited by Midwest in the Fourth Circuit that is closest to applicability is not a consumer lending case, but a South Carolina commercial case involving the sale of Volvo trucks in Georgia. *See, Carolina Trucks and Equipment, Inc. v. Volvo Trucks of North American, Inc.,* 492 F.3d. 484 (4th Cir.2007). There the case turned on "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id. At 489.* In the case at hand the North Carolina Statute operates to control business. If, indeed, as the North Carolina statute states, "all contractual activities" occur-out-of-state, then the lender escapes regulation. It is when TitleMax comes into the State that it finds itself and its conduct subject to regulation. As previously noted, TitleMax came into North Carolina to engage in discussion, if not also negotiation, by accepting the call from Claimant and engaging in discussion with her. Further, after making the loan to Claimant, TitleMax communicated directly with the North Carolina Division of Motor Vehicles to record the lien on Claimant's vehicle. These activities were conducted within North Carolina and are, under *Carolina Trucks,* not violative of the Commerce Clause. Accordingly, there is not violation of the Commerce Clause to be found from the operation of the North Carolina statute.

## Issue II

N.C. Gen. Stat. 75-1.1

A violation of the North Carolina Consumer Finance Act, Chapter 53 of the North Carolina General Statutes, may be a *per se* violation of Chapter 75. *State of NC v. NCCS Loans,* 174 N.C. App. 630 (2005). In this case the Court held:

> Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive practices." *Stanely v. Moore, 339 N.C. 717.723 (1995).* In this regard, we note that it is a "paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina Interest laws." N.C. Gen. Stat 24-2.1 (2003). Defendants practice of offering usurious loans was a clear violation of this policy. We conclude that the trial court did not err by ruling as a matter of law that this constitutes unfair or deceptive trade practices, in violation of N.C. Gen. Stat. 75-1;1 (2003).

The case at hand is similar. It establishes that Respondent charged Claimant a rate of interest that was usurious in that it exceeded by five times the rate of interest allowed by the North Carolina Consumer Finance Act, N.C. Gen Stat.53-176(a)(1). This violated a paramount public policy of North Carolina as stated in N.C. Gen. Stat. 24-2.1 to protect its resident borrowers. For the above reasons, the Loan violated North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. 75-1.1 and was a *per se* violation of that statute.

Out of state car title lenders are committing, if they are violating North Carolina's Consumer Finance and usury laws, an Unfair and Deceptive trade practices as a matter of law and that the "injured North Carolina consumer" has a "private right of action" to recover treble damages. *Wall* at19-21.

7

## Issue III

Having found that the cited provisions of the North Carolina Consumer Finance Act and the North Carolina Unfair and Deceptive Trade Practices Act were violated as set out above, the Arbitrator finds that the damages suffered by Claimant of $5,500.00 should be trebled totaling $16,500.00 pursuant to the provisions of N.C. Gen. Stat. 75-16.

WHEREFORE, Respondent is ordered to pay in damages the sum of $16,500.00 to Claimant.

Respondent is further ordered to pay pre and post award interest on that amount at the legal rate (8%) back to the date of filing the underlying state court action, April 2, 2019.

This Interim Award of Arbitrator is in full settlement of the merits of all claims submitted to this Arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs. Claimant shall submit its account of such reasonable attorney fees and costs and any supporting documents related thereto to the Arbitrator within ten (10) days of the date of this Interim Award of Arbitrator. Respondent shall submit any responsive statement and supporting documents within twenty (20) days of the date of this Interim Award of Arbitrator. Upon and after such submissions, the matter shall be deemed submitted to the Arbitrator for determination in a Final Award of Arbitrator

This Interim Award of Arbitrator shall remain in full force and effect until the Arbitrator renders a Final Award of Arbitrator.

December 12, 2022.

_____
Dailey J. Derr, Arbitrator